IN THE SUPREME COURT OF NORTH CAROLINA

No. 318PA22

Filed 23 May 2024

STATE OF NORTH CAROLINA

v.

CHARLES SINGLETON

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 285 N.C. App. 630 (2022), holding that the indictment charging defendant with second-degree forcible rape failed to confer jurisdiction upon the trial court and vacating the portion of the judgment convicting defendant of this crime entered on 5 August 2021 by Judge Jeffery B. Foster in Superior Court, Wake County. Heard in the Supreme Court on 19 September 2023.

*Joshua H. Stein, Attorney General, by Benjamin Szany, Assistant Attorney General, for the State-appellant.*

*Danielle Blass for defendant-appellee.*

BERGER, Justice.

Since 1811, the plain language and intent of the law has been to move away from common law pleading requirements in criminal cases which were overwrought with technicalities. But old habits die hard in the legal profession. More than two hundred years ago, the legislature eliminated strict common law pleading requirements for criminal indictments. But lawyers and judges continued to grasp

at "shadowy nothings" that permitted criminals to escape merited punishment. *State v. Hester*, 122 N.C. 1047, 1050 (1898). Despite recognition by this Court in 1898 that "[t]he practical sense of the age demand[ed]" that technicalities should not carry the day for defendants who argue form over substance in our indictment jurisprudence, *id.*, some continued to scour pleadings for procedural niceties long after guilty pleas had been entered or jury verdicts handed down.

Just as the pragmatic spirit of the 19th century disfavored this practice, functional wisdom and legal reality is that defendants were seldom prejudiced by mistakes in pleadings. Inconsistent application of the law led again to frustration and concern by the courts and the legislature—so much so that almost fifty years ago, the people through their elected representatives once again attempted to rid the criminal justice system of any remnants of the common law as it related to criminal pleadings.

To be sure, where a criminal indictment suffers from a jurisdictional defect, courts lack the ability to act. But jurisdictional defects are rare, only arising where an indictment wholly fails to allege a crime against the laws or people of this State. Where a court has no power to act in the first instance, jurisdictional defects can be raised at any time.

A mere pleading deficiency, however, is different. The people sought to end the superficial practice of vacating convictions and arresting judgment based on non-jurisdictional pleading deficiencies when Madison was president and Napoleon was

waging war in Europe. But for more than two centuries, our courts have inconsistently applied the statutory law of indictments to illusory harms.

Consistent with the federal courts and the majority of jurisdictions, we end this centuries old saga and hold that an indictment raises jurisdictional concerns only when it wholly fails to charge a crime against the laws or people of this State.[1] Further, and in accord with directives from the General Assembly, bills of indictment that contain non-jurisdictional deficiencies will not be quashed or cast aside "by reason of any informality" when they express the crime charged "in a plain, intelligible, and explicit manner," N.C.G.S. § 15-153 (2023), such that the defendant has "notice sufficient to prepare a defense and to protect against double jeopardy." *State v. Lancaster*, 385 N.C. 459, 462 (2023) (quoting *In re J.U.*, 384 N.C. 618, 623 (2023)). Both classes of indictment defects rely on a common sense approach to the law, and we, therefore, reverse the Court of Appeals.

## I. Factual and Procedural Background

On 25 November 2017, Jane, a college freshman visiting home on Thanksgiving break, spent the evening in downtown Raleigh with friends.[2] Jane consumed alcoholic beverages throughout the day, and she was significantly impaired

---

[1] *See United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[D]efects in an indictment do not deprive a court of its power to adjudicate a case."); *see also State v. Dunn*, 375 P.3d 332, 355 (Kan. 2016) ("Indeed, the view that a failure to include an essential element in the charging document is a jurisdictional defect ha[s] quickly become the minority view in state and federal jurisdictions.").

[2] A pseudonym is used to protect the victim's identity.

by the early morning hours of 26 November. The last thing Jane remembered from her night out in Raleigh was "[d]ancing with [her] sister and a family friend" at a bar around 2:00 a.m.

At 2:15 a.m., Jane's father received a call from one of Jane's friends who informed him that Jane had given her phone to a friend and walked away from the group alone. Jane's parents drove downtown, retrieved Jane's phone and began searching for their daughter.

At 5:25 a.m., Jane's mother noticed a missed call from an unknown number on Jane's phone. She called the number and a "strange man" answered the phone. The man, who said his name was "Chuck," informed Jane's mother that he was "helping a girl find her phone." When Jane's mother asked to speak with Jane to ensure her safety, the man said Jane ran away and that he was looking for her.

Jane's mother then called 911, hoping that the call with "Chuck" would lead police to her daughter. Raleigh Police Officer Mark Brodd called the unknown number and spoke with "Chuck," who informed Officer Brodd that he met Jane after she left a downtown club and "asked [him] to take care of her." According to "Chuck," he and Jane sat on a flower planter near an old post office, where Jane slept for an hour. When Jane woke up, she asked "Chuck" to help locate her phone. "Chuck" called her phone and began looking for it, and "when [he] turned [his] head, [and] looked back, she was gone."

Officer Brodd later identified "Chuck" as Charles Singleton. After "Chuck"

provided a false date of birth, the increasing number of discrepancies in "Chuck's" statements led Officer Brodd to suspect that defendant had kidnapped Jane. Around 6:00 a.m., Officer Brodd began calling defendant repeatedly, but defendant did not answer.

During this time, Jane's sister received a phone call from Jane on an unknown number. Jane was at a gas station and asked her sister to pick her up. Jane's sister drove to pick up Jane, who was "[d]isheveled and in fear." Jane's "underwear was hanging out the side of her pants." Jane was taken to a police station where she reported that a man matching defendant's description had raped her.

Jane stated that she had "blacked out" after leaving her friends early that morning and woke up in defendant's vehicle with him on top of her. She told defendant to get off, and when she could not locate her phone, she ran until she found the gas station. Jane, who was suffering memory loss and nausea, underwent a physical examination during which she seemed "hazy and still intoxicated." At noon, detectives noted that Jane still seemed impaired as she was "very woozy and unsteady on her feet" and almost fell over when she got up to leave the room.

Officers subsequently located defendant based off a GPS ping of his phone and a description of his vehicle. Defendant provided officers a different version of his story, stating that he had driven up and down Capital Boulevard with Jane "in an attempt to wake her up." He told police that Jane "was very intoxicated during this time and he was trying to sober her up in order to help her." Defendant, who did not

appear to be impaired in any way, stated that his DNA would not be located inside of Jane because he did not have sexual intercourse with her.

Police obtained DNA samples from defendant pursuant to a search warrant. Samples were also taken from Jane during her physical examination. Forensic testing revealed the presence of sperm on the vaginal, rectal, and external genitalia swabs, and on the tampon Jane was using that night. The DNA samples were consistent with defendant's DNA profile.

Defendant was arrested and subsequently indicted for second-degree forcible rape. On 19 March 2018, the grand jury returned a superseding indictment against defendant for second-degree forcible rape, first-degree kidnapping, and felonious restraint. As is relevant here, the superseding indictment against defendant for second-degree forcible rape alleged

> that on or about November 26, 2017, in Wake County, the defendant named above unlawfully, willfully, and feloniously did engage in vaginal intercourse with [Jane], who was at the time, physically helpless. This act was done in violation of NCGS § 14-27.22.

Defendant did not move to quash the indictment, object at trial to the language in the indictment, or otherwise contest the trial court's jurisdiction over him or the charged offense. Further, defendant did not argue that the indictment failed to put him on notice of the crime charged or failed to protect him from double jeopardy.

At the conclusion of trial, the jury found defendant guilty of all charges, and he was sentenced to consecutive prison terms of seventy-three to one hundred forty-

eight months for the second-degree forcible rape conviction and seventy-three to one hundred months for first-degree kidnapping. The trial court arrested judgment for defendant's felonious restraint conviction. Defendant timely appealed.

At the Court of Appeals, defendant argued for the first time that the superior court "lacked jurisdiction to try him" for the crime of second-degree forcible rape. *State v. Singleton*, 285 N.C. App. 630, 632 (2022).[3] Specifically, defendant contended that the trial court lacked jurisdiction because the indictment charging him with this crime failed to allege the element "that he knew or reasonably should have known that Jane was physically helpless when he engaged in sexual intercourse with her." *Id.*

The Court of Appeals noted that in most jurisdictions, "the failure to allege an essential element of a crime in the indictment is not jurisdictional and can be waived" and that treating such alleged defects "as non-jurisdictional," and therefore waivable, "appears to be the majority view." *Id.* at 633 (citing *United States v. Cotton*, 535 U.S. 625, 631 (2002) and *State v. Dunn*, 375 P.3d 332, 355 (Kan. 2016)). However, the Court of Appeals rejected the State's argument that the short-form indictment language was sufficient pursuant to statute and this Court's precedent, *id.*; *see also* N.C.G.S. § 15-144.1 (2021); *State v. Tart*, 372 N.C. 73, 77 (2019), and the Court of Appeals ultimately concluded that the indictment "simply fails to allege the crime"

---

[3] As jurisdiction is the relevant issue on appeal to this Court, we do not address additional arguments raised by defendant at the Court of Appeals.

even when compared to the relevant short-form indictment language. *Singleton*, 285 N.C. App. at 634. Based on this reasoning, the Court of Appeals vacated the portion of the judgment convicting defendant of second-degree rape and dismissed the indictment charging him with that crime. *Id.* at 636.

The State filed a petition for discretionary review, which this Court allowed on 3 March 2023. The State urges us to take this opportunity to examine our indictment jurisprudence and argues that the Court of Appeals erred in concluding the indictment failed to conform to the relevant short-form indictment language.[4]

## II. Analysis

## A. The Common Law Jurisdictional Indictment Rule

### 1. The Origin of the Rule

---

[4] Our dissenting colleague asserts that we should avoid an examination of our indictment jurisprudence and "wait for a case that presents the issue" of whether the common law jurisdictional indictment rule remains in force. In fact, this Court has already done just that by declining the State's recent invitations to address this issue in both *In re J.U.* and *State v. Lancaster*. *See* No. 263PA21, Appellant Brief p. 16; No. 240A22, Appellant Brief p. 18 and (Oral Arg. 14:20). The arguments in these cases demonstrate that issues surrounding the common law rule will not dissipate, and we choose to fulfill our duty to declare what the law is rather than allowing continued uncertainty among judges, prosecutors, and defense attorneys. After all, as we state elsewhere herein, cases in which an indictment wholly fails to charge a crime are rare, and under our dissenting colleague's reasoning, could never be reached.

Further, the State's couching of its jurisdictional argument as an alternative argument has no bearing on the force or validity of our holding on that issue. Even if the State had not presented this argument (and the defendant had not responded to it), the issue of jurisdiction can be addressed *sua sponte*—just as the Court of Appeals did in *State v. Lancaster*, 284 N.C. App. 465 (2022), *rev'd*, 385 N.C. 459 (2023). Our dissenting colleague's characterization of our analysis and holding on this issue as "largely dicta" is especially perplexing as the issue we address—the common law jurisdictional indictment rule—permits defendants to raise this jurisdictional argument at any time. As the merits of this issue have been fully briefed and argued by both parties in this case, and by others previously, we prudently undertake our duty to resolve this matter.

At the time of this State's founding, "many of our laws were derived from the British common law," and "[i]ndictments were no exception; some of our earliest cases on indictments drew their rules from English common law." *State v. Rankin*, 371 N.C. 885, 906 (2018) (Martin, C.J., dissenting). Indictment cases historically "imposed rigid technical requirements on indictments" that appear inconsistent with the modern criminal justice system. *Id.* For example, in one case, judgment was arrested following a conviction for murder where the description of the wound omitted the letter "a" from the word "breast." *State v. Carter*, 1 N.C. (Cam. & Nor.) 406, 407 (1801); *see also State v. Owen*, 5 N.C. (1 Mur.) 452, 461 (1810) (homicide indictment held invalid for failing to adequately describe the dimensions of the wound inflicted by defendant upon the victim).

This Court's predecessors considered these types of strict common law constraints on indictments unduly burdensome even in its earliest days but continued to enforce them, insisting that the problem could only be addressed by action of the legislative branch. *See State v. Adams*, 1 N.C. (Mart.) 56, 58 (1793) ("The niceties required in ancient times in law proceedings became a grievance and the statutes of *Jeofails* remedied the abuse in civil cases, but not in criminal."); *Harrington v. McFarland*, 1 N.C. (Cam. & Nor.) 543, 546–47 (1802) ("In penal actions precision in the charge is indispensable for the same reason that it is required in indictments; and none of the statutes of jeofail, nor even the Act of 1790 intends to them."); *Owen*, 5 N.C. (1 Mur.) at 458 ("But we must follow in the footsteps of those who have preceded

us until the Legislature think fit to interfere; though we have no wish to extend the particularity further.").

This adherence to ancient common law indictment rules was necessary because the common law had not been abrogated. *See Lancaster*, 385 N.C. at 463; *see also* N.C.G.S. § 4-1 (2023). But many, including jurists, viewed objections to superficial indictment defects under the common law as "a disease of the law, and a reproach to the bench" which were "reluctantly[ ] entertained." *State v. Moses*, 13 N.C. (2 Dev.) 452, 463 (1830). Still, our courts were confined to a formalistic approach while they waited for the General Assembly to modernize indictment requirements. *See Owen*, 5 N.C. (1 Mur.) at 458.

Thus, in 1811, the General Assembly eliminated the technical common law rules of pleading that elevated form over substance in criminal cases. According to this Court, the move away from the common law may have been prompted by our decision in *Owen*. *See Moses*, 13 N.C. (2 Dev.) at 463 ("The act of 1811 [was] passed the year after Owen's case was decided, and we have reason to believe was caused by it.").

The law, entitled "An act to regulate the proceedings on presentments or indictments, in the superior courts of law of this state," proclaimed that

> Whereas exceptions, in themselves merely formal, are frequently taken against bills of indictment or presentment, and they are either quashed or judgment arrested; in consequence of which, the execution of justice is delayed, and many offenders escape punishment: For remedy whereof,

> *Be it enacted*, [t]hat from and after the first day of March next, in all criminal prosecutions, which may be had by indictment or presentment, in any of the superior courts of law, it shall be sufficient to all intents and purposes, that the bill shall contain the charge against the criminal, expressed in a plain, intelligible, and explicit manner; and that no bill of indictment or presentment shall be quashed or judgment arrested, for or by reason of any informalities or refinements, when there appears to the court sufficient in the face of the indictment to induce them to proceed to judgment.

Potter's Revisal of 1819, Laws of 1811, Ch. 809.[5]

The preamble to this new law explicitly states the problem the statute sought to address: setting aside indictments on the basis of technicalities that delayed or prevented justice. This Court understood that the new law "was certainly designed to uphold the execution of public justice, by freeing the Courts from those fetters of *form, technicality* and *refinement*," i.e., common law pleading requirements, "which do not concern the substance of the charge, and the proof to support it." *Moses*, 13 N.C. (2 Dev.) at 464.

In 1854, the legislature further emphasized its distaste for the common law rule's rationale and consequences by enacting another similar law, now codified as N.C.G.S. § 15-155 (2023). The law, entitled "Certain defects in indictments not to vitiate," proclaimed:

> No judgment upon any indictment for felony or

---

[5] This law remains in force over two hundred years after its enactment, with only minor changes made to bring other charging documents within its scope. *See* N.C.G.S. § 15-153 (2023).

misdemeanor, whether after verdict, or by confession, or otherwise, shall be stayed or reversed for the want of the averment of any matter unnecessary to be proved, nor for omission of the words "as appears by the record," or of the words "with force and arms," nor for the insertion of the words "against the form of the Statutes" instead of the words "against the form of the Statute," or vice versa; nor for omitting to state the time at which the offence was committed, in any case where time is not of the essence of the offence, nor for stating the time imperfectly, nor for stating the offence to have been committed on a day subsequent to the finding of the indictment, or on an impossible day, or on a day that never happened; nor for want of a proper and perfect venue, when the court shall appear by the indictment to have had jurisdiction of the offence.

Ch. 35, § 20, Revised Code of 1854.

"It is not astonishing that defendants who have no meritorious ground of exception should clutch at shadowy nothings . . . ." *Hester*, 122 N.C. at 1050. But, even in the 19th century, this Court understood that "[t]he practical sense of the age demands that . . . immaterial variances and refinements and technicalities shall not avail defendants when they are not in truth prejudiced thereby." *Id.* After all, the judicial system "favors trials upon the merits." *Id.* Indeed, allowing a criminal defendant to escape merited punishment on such technicalities "brought the administration of justice into disrepute," especially where indictments are "so explicit that the defendants could not pretend . . . that they did not know [w]hat they were charged with." *State v. Leeper*, 146 N.C. 655, 659 (1908), *overruled on other grounds by In re Alamance Cnty. Ct. Facilities*, 329 N.C. 84 (1991).

Thus, this Court recognized that the rule's consequences, which do not benefit the public or the justice system, were offensive to such an extent that the legislature abrogated the common law's rigid technical requirements. *See Moses*, 13 N.C. (2 Dev.) at 464 ("We think the legislature meant to disallow the whole of them, and only require the substance, that is a direct averment of those facts and circumstances which constitute the crime, to be set forth."); *see also State v. Hedgecock*, 185 N.C. 714, 717 (1923) ("[T]he highly technical common–law procedure [is] . . . now almost entirely, if not altogether abolished here."); *State v. Switzer*, 187 N.C. 88, 96 (1924) ("Form, technicality, and refinement have given way to substance, and it is sufficient if the indictment contains the charge in a plain, intelligent, and explicit manner."); *State v. Linney*, 212 N.C. 739, 742 (1938) ("[E]ver since the Act of 1811 . . . informalities and refinements in the language of the bill may be properly disregarded, if the criminal offense be sufficiently described to inform the defendant of the charge against him, and to enable him to make his defense, and protect him from another prosecution for the same criminal act."); *State v. Nugent*, 243 N.C. 100, 101 (1955) ("G.S. 15-153 has abolished the requirement that the detailed particulars of a crime must be stated in the meticulous manner prescribed by the common law . . . ."); *State v. Sturdivant*, 304 N.C. 293, 311 (1981) (holding that where the "indictment reasonably notified defendant of the crime for which he was being charged by plainly describing *who did what and when* and by indicating which statute was violated by

such conduct[,] . . . it would not favor justice to allow defendant to escape merited punishment upon a minor matter of form").

The operative portion of the 1811 law impacting criminal pleadings had two main provisions. First, it contained a declaration that an indictment must charge a crime. *See* Potter's Revisal of 1819, Laws of 1811, Ch. 809 ("[I]t shall be sufficient to all intents and purposes, that the bill shall contain the charge against the criminal . . . ."); *see also* N.C.G.S. § 15-155 ("No judgment upon any indictment for felony or misdemeanor, whether after verdict, or by confession, or otherwise, shall be stayed or reversed for the want of the averment of any matter unnecessary to be proved . . . when the court shall appear by the indictment to have had jurisdiction *of the offense.*" (emphasis added)). Thus, failure to charge a crime was a barrier to the court's ability to act. Second, however, and contrary to the common law, bills of indictment in which a crime was charged "in a plain, intelligible, and explicit manner," N.C.G.S. § 15-153, shall not be set aside for technical deficiencies if the indictment was sufficient for the court to render judgment. When read alone or *in pari materia* with N.C.G.S. § 15-155, it is plainly apparent that the formalistic practice of the common law was to end, except where no crime at all was charged.

Despite the plain directive of the General Assembly and proclamations from this Court that we were no longer bound by "the rhetorical flourish of some ancient and forgotten pleader," *State v. Kirkman*, 104 N.C. 911, 911 (1889), entrenched ideas yield reluctantly. Thus, it was clear to our predecessors that since "[c]ourts have

looked with no favor upon technical objections[,] and the legislature has been moving in the same direction[,] [t]he current is all one way," *State v. Smith*, 63 N.C. 234, 236 (1869), i.e., away from the technicalities of the common law. Despite this recognition, our indictment jurisprudence was inconsistent at best.[6]

Then Justice Clark (later Chief Justice) appeared frustrated with the contradictory application of the law in this area when he stated that

> These technicalities and refinements doubtless originated in the humanity of the courts at a time when defendants on trial for the gravest offenses were not permitted the benefit of counsel, not allowed to have witnesses sworn in their behalf. 4 Bl., 459. They are an anachronism now. Their survival and occasional reappearance, after so many statutes and so many decisions, and when the reason for them and a knowledge of their origin even has passed away, is without a parallel, unless it is in the fact that our time-pieces still mark the fourth hour with IIII, which we are told, is due to the fact that the King of France, to whom the first watch was carried, unable to understand its mechanism, criticised the IV and ordered it replaced by the letters which, with Chinese exactness of imitation, are used by us today.
>
> They do no harm. But to sustain obsolete technicalities in indictments will be to waste the time of the courts, needlessly increase their expense to the public, multiply trials, and, in some instances, would permit defendants to evade punishment who could not escape upon a trial on the merits. If it has not the last mentioned result, it is no advantage to defendants to resort to technicalities, and, if

---

[6] This Court even observed vacillations in application of indictment statutes by the same Court. *See Kirkman*, 104 N.C. at 913 ("We are not unaware that a contrary view to ours has been held in *State v. Joyner*, 81 N.C. 534; but, in view of the broad and clear expressions of the statute, we cannot hold that case as authority, and deem the reasoning used and the conclusion reached in . . . *State v. Parker*, in the same volume, more consonant with the expressed will of the legislative power.").

> it has such effect, the courts should repress, as they do, a reliance upon them.
>
> There are cases where defects in an indictment or a civil pleading are matters of substance, and objection should be insisted on by the parties and sustained by the courts. But the letter and the spirit of legislation, both as to criminal and civil pleading, require only a plain and clear statement of the matters alleged, and when the objection to such statement is not substantial, but rests upon mere technicalities and refinements, it would be better for the party to disregard them, and go to trial upon the merits, if he has any to set up and rely on.

*State v. Harris*, 106 N.C. 682, 689–90 (1890).

The persistent focus on "obsolete technicalities," *id.*, by advocates and judges led the legislature to once again address deficient indictments, and any doubt regarding the continued application of the common law rule's technical requirements should have been dispelled by the General Assembly's enactment of the Criminal Procedure Act in 1975. *See* An Act to Amend the Laws Relating to Pretrial Criminal Procedure, ch. 1286, § 28, 1974 N.C. Sess. Laws 490, 557 ("None of the provisions of [the] [A]ct providing for repeal of certain sections of the General Statutes shall constitute a reenactment of the common law."). The Act was the result of a legislative proposal developed by the Criminal Code Commission between 1970–73, which recognized that "the statutory language of Chapter 15 of the General Statutes had become antiquated and inappropriate through the passage of time." *Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission*, at i (1973). "The goal of the Commission [was] . . . to prepare a balanced

legislative reform that would eliminate from our law, where desirable, those practices which frustrate the effective and efficient administration of justice without regard for which side might benefit from the practice in question." *Id.* at ii.

The Commission described its proposed bill as "a 'citizen oriented' bill." *Id.* at iii. The Commission specifically stated:

> We believe this bill is properly called a 'citizens bill' in that it is designed to serve the general public by saving the citizen's time as a juror, his time as a witness, and his time as a prosecuting victim even though it will require some departure from the more traditional ways of handling criminal cases in our courts.

*Id.*

The General Assembly thereafter left intact various provisions of Chapter 15, including sections 15-153 and 15-155, and enacted the Commission's proposed bill as the Criminal Procedure Act. *See* An Act to Amend the Laws Relating to Pretrial Criminal Procedure, ch. 1286, § 28, 1974 N.C. Sess. Laws 490. Among other things, the new Act was intended to "statutorily modernize[ ]the requirements of a valid indictment" and "shift away from the technical rules of pleading." *State v. Oldroyd*, 380 N.C. 613, 619 (2022) (cleaned up).

There can be little question that the Criminal Procedure Act removed any vestiges of the archaic, hyper-technical common law requirement that a valid indictment contain a rote recitation of elements. *See* N.C.G.S. § 15A-924(a)(5) (2023) (stating a valid indictment requires the State to "assert[ ] *facts supporting* every element of a criminal offense" (emphasis added)); *see also Lancaster*, 385 N.C. at 469

-17-

("[A]ll that is required for a sufficient indictment are factual allegations *supporting* the elements of the crime charged, not magic words or a rote recitation of elements." (cleaned up)); *In re J.U.*, 384 N.C. at 624 ("Consistent with a proper understanding of indictment jurisprudence . . . a juvenile petition does not have to state every element . . . so long as the elements are clearly inferable from the facts, duly alleged." (cleaned up)).

The Criminal Procedure Act was itself preceded by the legislature's enactment of short-form indictments, which "relieve[d] the State of the common law requirement that every element of [certain] offense[s] be alleged," and this Court has repeatedly upheld such action because "within constitutionally mandated parameters the legislature has the power to prescribe the form of a bill of indictment." *State v. Lowe*, 295 N.C. 596, 603 (1978) (citing *State v. Harris*, 145 N.C. 456 (1907) and *State v. Holder*, 153 N.C. 606 (1910)). "This action is within the legislature's prerogative so long as the newly prescribed indictment still complies with the constitutional requirement that the defendant be informed of the accusation against him." *Id.* Put another way, pleading deficiencies in short-form indictments go to notice, not jurisdiction, because short-form indictments unquestionably charge a crime.[7]

But this Court recently commented on this subject, demonstrating a similar

---

[7] Contrary to our dissenting colleague's assertion that our decision today "reverses [the] course" of indictment jurisprudence, this Court stated over one hundred and fifty years ago that "[c]ourts have looked with no favor upon technical objections[,] and the legislature has been moving in the same direction[,] [t]he current is all one way." *Smith*, 63 N.C. at 236. Our holding today simply follows this current.

misunderstanding of the issue that led to the inconsistent results our predecessors lamented. *See Rankin*, 371 N.C. at 895. Although the majority in *Rankin* stated that "statutory interpretation reveals that the legislature intentionally left the common law remedy for invalid indictments intact," *id.*, this statement directly contradicts the plain language of legislative enactments dating back to 1811 and decisions from our Court cited above. At a minimum, the discussion in *Rankin* concerning our indictment jurisprudence is self-acknowledged dicta as the majority correctly noted that "discussion of this issue [was] outside the scope of review applicable to this case." *Id.* Our dissenting colleague somehow misses this clear-throated pronouncement. But even if not dicta, the majority's position that we should still cling to these shadowy nothings was met with a well-reasoned and vigorous dissent, significantly diminishing its authority.[8] *See State v. Walker*, 898 S.E.2d 661, 665 (N.C. 2024) (Berger, J., concurring).

Even if the Criminal Procedure Act could be said not to directly address the jurisdictional aspect of the common law rule, it defies reason to argue that, when read together with N.C.G.S. §§ 15-153 and 15-155, a bill designed to "eliminate . . . those practices which frustrate the effective and efficient administration of justice" and "sav[e] the citizen's time as a juror, his time as a witness, and his time as a prosecuting witness" carried forward a common law rule that produces results

---

[8] Unlike in this case, the parties in *Rankin* never presented arguments regarding the continued application of the common law jurisdictional indictment rule.

directly contrary to these goals. *Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission*, at ii–iii (1973). Nonetheless, that is defendant's argument, which he contends is supported by our Constitution and the Criminal Procedure Act itself.

We begin with an overview of the two distinct species of indictment deficiencies, jurisdictional and non-jurisdictional, which the common law rule conflates. We then address defendant's specific constitutional and statutory arguments.

### 2. *The Common Law Rule Conflicts with our Constitution and General Statues*

*a. The Power to Decide a Case*

The term "jurisdiction" refers to a "court's power to decide a case or issue a decree." *Jurisdiction, Black's Law Dictionary* (11th ed. 2019). Such power is granted by the people who speak through their constitutions and statutes, not by an indictment drafted by a prosecutor.

> Rules of jurisdiction are addressed, so to speak, from a position outside the court system and prescribe the authority of the courts within the system. They are to a large extent constitutional rules. The provisions of the United States Constitution specify the outer limits of the jurisdiction of the federal courts and authorize Congress, within those limits, to establish by statute the organization and jurisdiction of the federal courts. . . . Within each state, the court system is established by state constitutional provisions or by a combination of such provisions and implementing legislation, which together define the authority of the various courts within the system.

Fleming James Jr. & Geoffrey C. Hazard Jr., *Civil Procedure* § 2.1, at 55 (3d ed. 1985).

"While the federal constitution limits the federal 'judicial Power' . . . our Constitution, in contrast, has no such case or controversy limitation to the 'judicial power.' " *Comm. to Elect Dan Forest v. Emp.'s Pol. Action Comm.*, 376 N.C. 558, 591 (2021). We reference federal case law for illustrative purposes, mindful that these holdings are not binding upon this Court's consideration of the North Carolina Constitution.

The common law rule, which proclaims that a court's subject-matter jurisdiction hinges on a pleading's sufficiency, is based on an outdated and " 'expansive notion of "jurisdiction," ' . . . which was 'more a fiction than anything else.' " *U.S. v. Cotton*, 535 U.S. 625, 630 (2002) (first quoting *Custis v. United States*, 511 U.S. 485, 494 (1994), then quoting *Wainwright v. Sykes*, 433 U.S. 72, 79 (1977)). The common law rule's "elastic concept of jurisdiction is not what the term 'jurisdiction' means today, *i.e.*, 'the courts' statutory or constitutional *power* to adjudicate the case.' " *Id.* (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998)).

"Jurisdiction is a matter of power, and covers wrong as well as right decisions." *Lamar v. U.S.*, 240 U.S. 60, 64 (1916). "[N]othing can be clearer than that the [trial court], which has jurisdiction of all crimes cognizable under the authority of the United States, acts equally within its jurisdiction whether it decides a man to be guilty or innocent . . . ." *Id.* at 65 (citation omitted). Thus, in the federal courts "a

ruling 'that the indictment is defective does not affect the jurisdiction of the trial court to determine the case presented by the indictment.'" *Cotton*, 535 U.S. at 631 (quoting *U.S. v. Williams*, 341 U.S. 58, 66 (1951)).

However, because federal courts' authority over criminal matters extends only to "offenses against the laws of the United States," *Williams*, 341 U.S. at 65–66, "if the charged conduct itself is not criminal, then an offense against the United States has not been pled and the [trial] court lacks subject matter jurisdiction." *U.S. v. Moore*, 954 F.3d 1322, 1333 (11th Cir. 2020). As the "absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense against the United States," these types of indictment defects do not affect federal courts' jurisdiction. *Id.*

> The lynchpin for a defect that implicates jurisdiction is whether the indictment charged the defendant with a criminal offense against the laws of the United States. . . . In other words, when the indictment itself fails to charge a crime, the [trial] court lacks jurisdiction. However, while the omission of an element may render the indictment insufficient, it does not strip the [trial] court of jurisdiction over the case.

*Id.* at 1334 (cleaned up). "Since Congress has provided the [trial] courts with jurisdiction," if an indictment "charg[es] [a defendant] with violating laws of the United States, the [trial] court [is] empowered to hear the case." *Id.* at 1335 (cleaned up).

This reasoning is highly persuasive and aligns with N.C.G.S. §§ 15-153 and 15-155. In simple terms, a court's jurisdiction to decide criminal cases flows directly

from the people speaking through their constitution and statutes and cannot be destroyed by other means. This concept is not unfamiliar to our courts, as we have held that where an indictment fails to charge a crime falling within the scope of the court's jurisdiction, the matter is a nullity.[9] *See State v. Beasley*, 208 N.C. 318, 320 (1935) (reversing conviction for a kidnapping charge as the crime was committed beyond "[t]he territorial jurisdiction of the superior court"); *State v. Rawls*, 203 N.C. 436, 438 (1932) (dismissing action against the defendant because the crime charged was not "within the original jurisdiction of the county court of Pitt county"). This reasoning is also consistent with N.C.G.S. § 15-153—an indictment must charge a crime to be valid, but superficial errors in the manner or form of the charge shall not impact the validity of the indictment and cannot affect the court's jurisdiction over the charged crime. *See also* N.C.G.S. § 15-155 ("No judgment upon any indictment .

_____

[9] Our dissenting colleague conflates this concept with the notion of personal jurisdiction, stating that if an indictment fails to allege all essential elements of a crime "there is no personal jurisdiction because . . . the defendant did not violate a criminal law." This argument goes to the merits of the case, not jurisdiction. Any person who commits a crime against the people or laws of this State within the boundaries of this State is subject to the jurisdiction of our general courts of justice. The muddying of jurisdictional waters reveals a deeper flaw in the dissent's reasoning. According to our dissenting colleague, an indictment that fails to assert the "essential elements" of a crime would fail to allege that the defendant "violate[d] a criminal law." The federal courts, most jurisdictions in this nation, and our own criminal statutes and precedents disagree. *See Moore*, 954 F.3d at 1333 (concluding that the "absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense against the United States"); *State v. Dunn*, 375 P.3d 332, 355 (Kan. 2016) ("Indeed, the view that a failure to include an essential element in the charging document is a jurisdictional defect ha[s] quickly become the minority view in state and federal jurisdictions"); N.C.G.S. § 15-144.1(a) ("In indictments for rape it is not necessary to allege every matter to be proved at trial"); *Lowe*, 295 N.C. at 603–04 (stating short-form statutes "relieve the State of the common law requirement that every element of the offense be alleged").

. . shall be stayed or reversed for [superficial errors] . . . when the court shall appear by the indictment to have had jurisdiction over the offense.").

The legislature's command that an indictment "*shall not* be quashed, nor the judgment thereon stayed" because of such errors, N.C.G.S. § 15-153 (emphasis added), is an explicit legislative statement that mere pleading deficiencies are not jurisdictional concerns. The common law rule's archaic notion of "jurisdiction" muddies the distinction between these two types of indictment defects—failure to charge a crime on the one hand, and failure to allege with sufficient precision facts and elements of a crime thereby permitting the defendant to prepare a defense and the court to render judgment on the other. "It is the allegation of criminal conduct . . . that activates a court's jurisdiction," *Bennington v. Com.*, 348 S.W.3d 613, 622 (Ky. 2011), not a recitation of elements with perfection.

With this distinction in mind, we now consider defendant's arguments that the common law rule, which treats the latter defect as if it were the former, aligns with the North Carolina Constitution and the Criminal Procedure Act.

### b. *Our Constitution*

We begin with our Constitution, which provides that "[e]xcept in misdemeanor cases initiated in the District Court Division, no person shall be put to answer any criminal charge but by indictment, presentment, or impeachment." N.C. Const. art. I, § 22. Defendant argues that this provision, coupled with the declaration that "every person charged with crime has the right to be informed of the accusation," N.C. Const.

art. I, § 23, conclusively demonstrates that a valid indictment must allege all elements of an offense and is necessary to confer jurisdiction over criminal proceedings. We disagree.

First, it does not follow that because our Constitution guarantees criminal defendants the right to be informed of the charge against them, such right can only be vindicated by alleging all elements of a crime with precision. If that were so, we would not have sanctioned short-form indictments that "relieve the State of the *common law requirement* that every element of [certain] offense[s] be alleged," *Lowe*, 295 N.C. at 603 (emphasis added), nor could we have upheld a statute requiring indictments to "assert[ ] *facts supporting* every element of a criminal offense." N.C.G.S. § 15A-924(a)(5) (emphasis added); *see also Lancaster*, 385 N.C. at 469 ("[A]ll that is required for a sufficient indictment are factual allegations *supporting* the elements of the crime charged, not magic words or a rote recitation of elements." (cleaned up)); *In re J.U.*, 384 N.C. at 624 ("Consistent with a proper understanding of indictment jurisprudence . . . a juvenile petition does not have to state every element . . . so long as the elements are clearly inferable from the facts, duly alleged." (cleaned up)); *State v. Jordan*, 75 N.C. App. 637, 639, *cert. denied*, 314 N.C. 544 (1985) ("Contrary to defendant's contention, a criminal pleading does not have to state every element of the offense charged . . . .").[10] Moreover, as discussed above, both N.C.G.S.

---

[10] Notably, our dissenting colleague agrees that short-form indictments are permissible despite their failure to allege every element of an offense. This is so, apparently, because short-form indictments still fulfill their constitutional purpose of providing notice

§§ 15-153 and 15-155 plainly recognize that these formal shortcomings are not jurisdictional. Thus, a rote recitation of elements is not required to confer jurisdiction by our Constitution, statutes, or case law.

Second, presuming arguendo that failure to allege an element equates to lack of notice, it does not follow that a violation of a defendant's constitutional right to be informed of the charge against him reflexively implicates jurisdictional concerns. Criminal defendants possess many constitutional rights—such as the right to be free from unreasonable searches and seizures, the right to remain silent, the right to effective counsel, the right to a speedy trial, the right to confront the witnesses against them, the right against excessive bail—yet violations of these rights do not deprive a court of jurisdiction. *See Cotton*, 535 U.S. at 630 (concluding that such an "elastic concept of jurisdiction is not what the term 'jurisdiction' means today, i.e., the courts' statutory or constitutional *power* to adjudicate the case" (cleaned up)).

Finally, defendant's argument ignores the remainder of Article I, Section 22, which provides that "any person, when represented by counsel, may, under such regulations as the General Assembly shall prescribe, *waive indictment* in noncapital cases." N.C. Const. art. I, § 22 (emphasis added). Defendant's contention that Article

---

*without alleging every element*. Why is it that we should measure short-form indictments against their ability to provide notice, but not engage in such an analysis of an allegedly deficient indictment just because it is not a short-form indictment? Under the dissent's reasoning, failing to allege every element is equivalent to failing to charge a crime *regardless of whether notice is provided*—but short-form indictments, which do not allege every element, properly charge a crime and provide notice.

I, Section 22's indictment requirement implicates jurisdictional concerns conflicts with the fundamental maxim that "[j]urisdiction over the subject-matter of an action cannot be waived or conferred by consent." *Dees v. Apple*, 207 N.C. 763, 766 (1935); *see also Cotton*, 535 U.S. at 630 ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."); *Moore*, 954 F.3d at 1336 ("Ultimately, the law is clear: the omission of an element in an indictment does not deprive the [trial] court of subject matter jurisdiction. . . . This principle is buttressed by the fact that defendants can waive their right to indictment by a grand jury . . . . In contrast, subject matter jurisdiction can *never* be waived, and a court can raise that issue *sua sponte* at any time." (cleaned up)).[11]

Article I, Section 22 contains no language regarding jurisdiction. Yet defendant and our dissenting colleague would have this Court inject jurisdiction into a provision that is silent on the matter, and on which the legislature has spoken,

_____

[11] Defendant's argument, and our prior indictment jurisprudence on which both he and our dissenting colleague rely, may stand on firmer footing were our Constitution of 1868 still in force. *Compare* N.C. Const. art. I, § 22 ("Except in misdemeanor cases initiated in the District Court Division, no person shall be put to answer any criminal charge but by indictment, presentment, or impeachment. *But any person, when represented by counsel, may, under such regulations as the General Assembly shall prescribe, waive indictment in noncapital cases.*" (emphasis added)); *with* N.C. Const. of 1868, art. I, § 12 ("No person shall be put to answer any criminal charge except as hereinafter allowed, but by indictment, presentment, or impeachment."). This subtle change has meaning which escapes our dissenting colleague's analysis, an error that is just one contributing factor to the dissent's flawed reasoning. It is fundamental that one cannot consent to jurisdiction, *see Dees*, 207 N.C. at 766 ("Jurisdiction over the subject-matter of an action cannot be waived or conferred by consent"), and a bill of information that is properly consented to by all parties and filed in the superior court division may lack jurisdiction if it fails to allege a crime against the people or laws of this State. It will not, however, fail to confer jurisdiction for mere technical deficiencies.

while simultaneously interpreting such provision to allow waiver of jurisdiction. Flexible as the common law may be, it cannot be contorted to rewrite our Constitution, which provides the source of superior court jurisdiction over violations of North Carolina laws. "Except as otherwise provided by the General Assembly, the Superior Court shall have original general jurisdiction throughout the State." N.C. Const. art. IV, § 12(3). Thus, defendant's contention that Article I, Section 22 supports his argument is without merit.

Our Constitution is clear. Where it discusses indictments, it does not discuss jurisdiction—where it discusses jurisdiction, it does not discuss indictments. The common law rule that indictments are jurisdictional and must allege each element of an offense with precision has no support in the plain text of our Constitution.[12] Nevertheless, defendant contends that even if the rule is not rooted in our Constitution, it is codified by our General Statutes. We disagree.

### c. *Our General Statutes*

Defendant argues that multiple provisions of the Criminal Procedure Act support his contention that the Act codified, rather than abrogated, the common law rule.[13] Specifically, defendant relies on subsections 15A-924(a)(5) and (6), 15A-924(e),

---

[12] Our dissenting colleague references due process concerns. However, she fails to cite an example where a due process violation robs a court of jurisdiction. Where there are legitimate due process implications due to deficiencies in indictments, as in other contexts, those issues can and should be addressed in the trial court. The failure to raise such issues, as discussed further herein, goes to the effectiveness of defendant's counsel, not jurisdiction.

[13] We are not unaware of our prior case law which applied rigid adherence to the common law rule; in fact we acknowledge inconsistent application. But the precedent relied

15A-952(d), 15A-1442(2)(b), 15A-1446(d)(4), and 15A-1447(b). Before addressing each provision, we again point to the two-hundred-year history of legislative enactments and judicial declarations contrary to his position and note that "[g]eneral jurisdiction for the trial of criminal actions is vested in the superior court and the district court divisions of the General Court of Justice." N.C.G.S. § 7A-270 (2023).

Defendant's first argument concerns the mandate in subsection 15A-924(a)(5) that a statutorily sufficient criminal pleading contain "[a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense." N.C.G.S. § 15A-924(a)(5). This Court has held that unlike the common law rule, this subsection does not require " 'magic words' or a rote recitation of elements" and that an indictment complies with this subsection if the elements of the offense are " 'clearly inferable' from the allegations in the indictment." *Lancaster*, 385 N.C. at 469 (quoting *In re J.U.*, 384 N.C. at 624). The common law rule's requirement that an indictment allege every element therefore conflicts with both subsection 15A-924(a)(5) and this Court's precedent.

Defendant also relies on subsection 15A-924(a)(6), which provides that a criminal pleading must contain "[f]or each count a citation of any applicable statute,

---

on by my dissenting colleague has less weight because "it conflicts with a pertinent statutory provision to the contrary," and we may not "by a line of erroneous decisions overrule a statutory enactment." *State v. Mobley*, 240 N.C. 476, 487 (1954). After all, "stare decisis is not an inexorable command." *State v. Hilton*, 378 N.C. 692, 730–31 (Earls, J., dissenting) (cleaned up).

rule, regulation, ordinance, or other provision of law alleged therein to have been violated. Error in the citation or its omission is not ground for dismissal of the charges or reversal of a conviction." N.C.G.S. § 15A-924(a)(6) (2023). We note this statute, like sections 15-153 and 15-155, is fundamentally inconsistent with the common law rule under which any errors in the charging document placed the criminal charge in jeopardy of dismissal. *See* Potter's Revisal of 1819, Laws of 1811, Ch. 809 ("Whereas exceptions, in themselves merely formal, are frequently taken against bills of indictment . . . no bill of indictment or presentment shall be quashed or judgment thereon arrested, for or by reason of any informalities or refinements . . . .").

Defendant further contends that because subsection 15A-924(a)(5) does not contain the second sentence of subsection 15A-924(a)(6), the General Assembly intended noncompliance with subsection 15A-924(a)(5) to result in dismissal of charges or reversal of a conviction. Interestingly, defendant does not assert that noncompliance with subsections 15A-924(a)(1) to (4) and (7), none of which contain the second sentence of subsection 15A-924(a)(6), should result in dismissal of charges or reversal of a conviction. Rather than read a non-existent mandate into subsections 15A-924(a)(1) to (5) and (7), we prefer to follow the words actually contained in the statute.

Specifically, we turn to subsection 15A-924(e). That provision provides:

> Upon motion of a defendant under G.S. 15A-952(b), the court must dismiss the charges contained in a pleading which fails to charge the defendant with a crime in the manner required by subsection (a), unless the failure is

> with regard to a matter as to which an amendment is
> allowable.

N.C.G.S. § 15A-924(e) (2023). As this provision applies only to motions made under

subsection 15A-952(b), its meaning must be determined by examining subsection

15A-952(b). That subsection provides, in relevant part:

> Except as provided in subsection (d), when the following
> motions are made in superior court they must be made
> within the time limitations stated in subsection (c) unless
> the court permits filing at a later time:
>
> . . . .
>
> (6) Motions addressed to the pleadings, including:
>
> a. Motions to dismiss for failure to plead under G.S. 15A-
> 924(e).

N.C.G.S. § 15A-952(b) (2023). Subsection 15A- 952(e) further provides that "[f]ailure

to file the motions in subsection (b)," i.e., motions to dismiss for failure to plead under

subsection 15A-924(e), "constitutes a waiver of the motion." N.C.G.S. § 15A-952(e).[14]

Taken together, these statutes operate as follows.

First, the State is required to "assert[ ] facts supporting every element of a

---

[14] This statute reinforces our precedent requiring a defendant to move for a bill of particulars prior to trial before requesting arrest of judgment after an unfavorable verdict. *See State v. Brown*, 320 N.C. 179, 192 (1987) ("[I]f, despite the sufficiency of the indictment, defendant was at a loss to determine the specific facts underlying the charges . . . , his proper recourse was to move for a bill of particulars."); *State v. Shade*, 115 N.C. 757, 758–59 (1894) ("[T]he defendant . . . may before trial move the court to order that a bill of particulars be filed, and the court will not arrest the judgment after verdict where he attempts to reserve his fire until he takes first the chance of acquittal. . . . With such safeguards thrown around prosecutions, it must be the fault of the person charged if he goes to trial without being 'informed of the accusation against him.' ").

criminal offense" in the indictment.[15]    N.C.G.S. § 15A-924(a)(5).    Second, if the

defendant believes the indictment "fails to charge . . . a crime in the manner required

by subsection (a)," N.C.G.S. 15A-924(e), that is, by failing to assert facts supporting

every element of the charge, the defendant may file a motion within a limited

timeframe in superior court seeking to dismiss the charge.    N.C.G.S. § 15A-

952(b)(6)(a).  If the defendant fails to timely file such motion, it is waived.  N.C.G.S.

§ 15A-952(e).  Finally, if the motion was timely filed, and if the superior court agrees

with the defendant, it must dismiss the charge.  N.C.G.S. § 15A-924(e).  But unlike

the common law rule, such a dismissal is on statutory rather than jurisdictional

grounds.  *See Lancaster*, 385 N.C. at 462 ("Although earlier common law principles

certainly conveyed that defective indictments implicated jurisdictional concerns, . . .

the Criminal Procedure Act represent[s] a sharp departure from the demands of

technical pleading."); *Oldroyd*, 380 N.C. at 619 ("[T]he Criminal Procedure Act of

1975 . . . statutorily modernize[d] the requirements of a valid indictment.").

Defendant argues that "[t]here is nothing in these statutes which suggests the

General Assembly . . . wants to move away from the practice of treating indictments

as jurisdictional requirements."  Defendant has not discussed or otherwise argued

---

[15] This requirement is obviously relaxed where the State proceeds with a short-form indictment.  *See* N.C.G.S. § 15-144.1(a) ("In indictments for rape it is not necessary to allege every matter to be proved at trial"); *see also Lowe*, 295 N.C. at 603–04 (stating short-form statutes "relieve the State of the common law requirement that every element of the offense be alleged" and advising that "a defendant who feels that he may be taken by surprise at trial may ask for a bill of particulars to obtain information in addition to that contained in the indictment which will clarify the charge against him.").

the legislative history or court commentary set forth above that is fundamentally contrary to his position. Moreover, the requirement that motions to dismiss for failure to plead under subsection 15A-924(e) be made in superior court within a certain time limit, and the directive that failure to timely move waives such motion, differentiate these motions from jurisdictional questions. Because "[t]he question of subject matter jurisdiction may be raised at any time, even in the Supreme Court," *Lemmerman v. A.T. Williams Oil Co.*, 318 N.C. 577, 580 (1986), and because "[j]urisdiction over the subject-matter of an action cannot be waived or conferred by consent," *Dees*, 207 N.C. at 266, subsections 15A-924(e) and 15A-952(b) do not treat pleading errors as jurisdictional issues. Further, the Criminal Procedure Act's elimination of the common law's rote recitation of elements requirement, and the Act's statutory allowance of certain pleading errors, demonstrate the General Assembly's intent to untangle the sufficiency of charging documents from the courts' power to decide a case. *See* N.C.G.S. § 7A-270 ("General jurisdiction for the trial of criminal actions is vested in the superior court and the district court divisions of the General Court of Justice.").

Notably, subsection 15A-952(d) provides that "[m]otions concerning jurisdiction of the court or the failure of the pleading to charge an offense may be made at any time." N.C.G.S. § 15A-952(d) (2023). Subsection 15A-952(d)'s phrase "failure of the pleading to charge an offense" is distinct from the language of subsection 15A-924(e), which concerns a failure "to charge the defendant with a crime

in the manner required by subsection [15A-924](a)." *Compare* N.C.G.S. § 15A-952(d), *with* N.C.G.S. § 15A-924(e). This is also consistent with the bifurcation in N.C.G.S. §§ 15-153 and 15-155.

For example, a motion to dismiss an indictment for larceny that "fail[ed] to charge the defendant . . . in the manner required by subsection [15A-924](a)," N.C.G.S. § 15A-924(e), by failing to assert facts supporting each element of larceny, would be properly made in superior court under subsections 15A-924(e) and 15A-952(b)(6)(a) and would be subject to waiver for lack of timeliness. A motion to dismiss an indictment charging the accused with wearing a pink shirt on a Wednesday—conduct that does not constitute a criminal offense—would be properly made at any time under subsection 15A-952(d) and would not be subject to such waiver. *See Moore*, 954 F.3d at 1333 ("The absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense . . . . However, if the charged conduct itself is not criminal, . . . the [trial] court lacks subject matter jurisdiction."). A similar result would be had for charging a defendant with a crime committed in another state.

Nothing in the statutes discussed above indicates that the State's noncompliance with subsection 15A-924(a) could rob the superior court of jurisdiction or that the State's compliance would bestow such jurisdiction. The reason is simple; our Constitution confers jurisdiction, and the General Assembly reaffirms that principle elsewhere in our General Statues. *See* N.C. Const. art. IV, § 12(3) ("Except

as otherwise provided by the General Assembly, the Superior Court shall have original general jurisdiction throughout the State."); N.C. Const. art. IV, § 12(4) ("The General Assembly shall . . . prescribe the jurisdiction and powers of the District Courts and Magistrates."); N.C.G.S. § 7A-270 ("General jurisdiction for the trial of criminal actions is vested in the superior court and the district court divisions of the General Court of Justice."); N.C.G.S. § 7A-271(a) (2023) ("The superior court has exclusive, original jurisdiction over all criminal actions not assigned to the district court division by this Article."); N.C.G.S. § 7A-272(a) (2023) ("Except as provided in this Article, the district court has exclusive, original jurisdiction for the trial of criminal actions, including municipal ordinance violations, below the grade of felony, and the same are hereby declared to be petty misdemeanors.").

Defendant next argues that section 15A-1442 supports his argument that the General Assembly has codified, rather than abrogated, the common law jurisdictional indictment rule. In relevant part, the statute provides:

> The following constitute grounds for correction of errors by the appellate division.
>
> (1) **Lack of Jurisdiction.** —
>
> a. The trial court lacked jurisdiction over the offense.
>
> b. The trial court did not have jurisdiction over the person of the defendant.
>
> (2) **Error in the Criminal Pleading.** — Failure to charge a crime, in that:
>
> a. The criminal pleading charged acts which at the time

they were committed did not constitute a violation of criminal law; or

b. The pleading fails to state essential elements of an alleged violation as required by G.S. 15A-924(a)(5).

N.C.G.S. § 15A-1442 (2023). Again, the General Assembly's differentiation between jurisdictional and non-jurisdictional errors in criminal pleadings cuts against defendant's argument. The General Assembly's separation of these errors indicates abrogation, not codification, of the common law rule which had entangled them. We note that subsections 15A-1442(2)(a) and (b) repeat the delineation between a pleading that fails to charge acts that do not violate criminal law and a pleading that fails to comply with subsection 15A-924(a)(5). *See Moore*, 954 F.3d at 1333 ("The absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense . . . . However, if the charged conduct itself is not criminal, . . . the [trial] court lacks subject matter jurisdiction."); *see also* N.C.G.S. § 15-153.

Next, defendant contends that subsection 15A-1446(d)(4) supports his argument because it automatically preserves pleading errors for appellate review. Subsection 15A-1446(d)(4) provides that an alleged error based upon the ground that "[t]he pleading fails to state essential elements of an alleged violation, as required by G.S. 15A-924(a)(5)" is subject to appellate review "even though no objection or motion has been made in the trial division." N.C.G.S. § 15A-1446(d)(4) (2023).

Once again, defendant relies on a statute in which the General Assembly has specifically differentiated between jurisdictional and non-jurisdictional pleading

errors. *See* N.C.G.S. § 15A-1446(d)(1) (2023) (providing automatic preservation of alleged errors based upon "[l]ack of jurisdiction of the trial court over the offense of which the defendant was convicted"); N.C.G.S. § 15A-1446(d)(2) (2023) (providing automatic preservation of alleged errors based upon "[l]ack of jurisdiction of the trial court over the person of the defendant"). As with the statutory provisions discussed above, subsection 15A-1446(d)'s distinction between these two species of indictment defects supports the conclusion that the General Assembly has abrogated the common law jurisdictional indictment rule.

Although not strictly necessary to the resolution of this issue, we note that this Court views subsection 15A-1446(d) with skepticism because our Constitution provides that "[t]he Supreme Court shall have exclusive authority to make rules of procedure and practice for the Appellate Division." N.C. Const. art. IV, § 13(2). This Court exercises this constitutional authority by promulgating the Rules of Appellate Procedure and has held that to the extent provisions of subsection 15A-1446(d) conflict with the Rules of Appellate Procedure, the Rules prevail and "the statute must fail." *State v. Bennett*, 308 N.C. 530, 535 (1983) (holding subsection 15A-1446(d)(13) unconstitutional); *see also State v. Elam*, 302 N.C. 157, 160 (1981) (holding subsection 15A-1446(d)(6) unconstitutional).

Here, there appears to be no conflict between our Rules and subsection 15A-1446(d)(4). Rule 10 of the Rules of Appellate Procedure provides in relevant part that "[a]ny such issue . . . which was deemed preserved . . . including . . . whether the court

had jurisdiction over the subject matter, and whether a criminal charge is sufficient in law, may be made the basis of an issue presented on appeal." N.C. R. App. P. 10(a)(1). Thus, on this issue our Rules of Appellate Procedure align with the Criminal Procedure Act by differentiating between jurisdictional and non-jurisdictional pleading issues and by automatically preserving both for appellate review.

We note that while Rule 10 automatically preserves issues of "whether a criminal charge is sufficient in law," it does not follow that all issues related to deficient indictments are jurisdictional merely because subject matter jurisdiction may be raised at any time. If we were to accept this proposition, we would also have to accept that the issue of whether a "judgment is supported by the verdict or by the findings of fact and conclusions of law" is jurisdictional simply because it is automatically preserved by Rule 10. N.C. R. App. P. 10(a)(1). Those familiar with appellate courts will recognize the absurdity of this notion. Ultimately, both subsection 15A-1446(d) and Rule 10 weaken, rather than strengthen, defendant's argument.

Finally, defendant contends that subsection 15A-1447(b) supports his argument because it mandates reversal of the judgment and dismissal of the charge if "the facts charged in a pleading were not at the time charged a crime." N.C.G.S. § 15A-1447(b) (2023). There are two issues with defendant's contention that this subsection indicates codification, rather than abrogation, of the common law jurisdictional indictment rule.

First, it does not follow that because the remedy mandated is reversal of the judgment and dismissal of the charge, the harm compelling that remedy is jurisdictional in nature. Subsection 15A-1447(c) mandates the same remedy of reversal and dismissal if "the evidence with regard to a charge is insufficient as a matter of law," unless there is "evidence to support a lesser included offense," in which case "the court may remand for trial on the lesser offense." N.C.G.S. § 15A-1447(c) (2023). No one would seriously contend that the State's failure to present sufficient evidence to survive a defendant's motion to dismiss amounts to a failure to cloak the trial court with jurisdiction.

Second, we are not convinced by defendant's expansive reading of subsection 15A-1447(b). Defendant appears to argue that this subsection applies to *any* pleading error, including failure to "assert[ ] facts supporting every element of a criminal offense" under subsection 15A-924(a)(5). *See* N.C.G.S. § 15A-924(a)(5). However, the plain language of subsection 15A-1447(b) contemplates circumstances in which an indictment properly alleges a violation of the laws of this State, but the alleged conduct did not violate criminal law at the time it occurred. Such circumstances would exist if the State charged a person with violating an ex post facto law, e.g., one which retroactively criminalizes conduct. Or, by way of another example, if the State charged a person with exceeding a school zone's posted speed limit despite the conduct occurring outside of the school zone's effective posted hours. In both cases, a defendant's argument would go to the merits of the case rather than jurisdiction.

-39-

In sum, a review of the Criminal Procedure Act and the history leading to its adoption does not indicate that our General Assembly has codified the common law jurisdictional indictment rule. Instead, the repeated distinction between jurisdictional and non-jurisdictional pleading errors demonstrates that the Criminal Procedure Act abrogated any remnant of the common law jurisdictional indictment rule.

"When the General Assembly as the policy making agency of our government legislates with respect to the subject matter of any common law rule, the statute supplants the common law and becomes the law of the State." *News & Observer Publ'g Co. v. State ex rel. Starling*, 312 N.C. 276, 281 (1984). Because the Criminal Procedure Act abrogated any remaining portion of the common law jurisdictional indictment rule that may have survived implementation of N.C.G.S. §§ 15-153 and 15-155, that common law rule has been supplanted and is no longer the law in this State.

Our Constitution and General Statutes, not an indictment, confer the general courts of justice with jurisdiction over criminal laws and the defendants accused of violating such laws. We join the Supreme Court of the United States and the majority of our sister states in recognizing that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Cotton*, 535 U.S. at 630; *see also State v. Dunn*, 375 P.3d 332, 355 (Kan. 2016) ("Indeed, the view that a failure to include an essential element in the charging document is a jurisdictional defect ha[s] quickly become the

minority view in state and federal jurisdictions.").

### 3. *Challenging and Reviewing an Allegedly Defective Indictment*

The abrogation of the common law rule does not relieve the State of its duty to draft indictments in a manner that "satisf[ies] both statutory strictures and . . . constitutional purposes." *Lancaster*, 385 N.C. at 462 (quoting *In re J.U.*, 384 N.C. at 623). Nor does such abrogation prevent defendants from obtaining relief if the State fails to effectively discharge this duty. Our Constitution grants this Court the "exclusive authority to make rules of procedure and practice for the Appellate Division," N.C. Const. art. IV, § 13(2), and our Rules of Appellate Procedure provide that the issue of "whether a criminal charge is sufficient in law" is automatically preserved for appellate review. N.C. R. App. P. 10(a)(1). Thus, issues related to alleged indictment defects, jurisdictional or otherwise, remain automatically preserved despite a defendant's failure to object to the indictment at trial.

But, where non-jurisdictional deficiencies exist in criminal indictments, the better practice is for defendants to raise the issue in the trial courts. *See State v. Brown*, 320 N.C. 179, 192 (1987) ("[I]f, despite the sufficiency of the indictment, defendant was at a loss to determine the specific facts underlying the charges . . . , his proper recourse was to move for a bill of particulars."); *State v. Shade*, 115 N.C. 757, 758–59 (1894) ("[T]he defendant . . . may before trial move the court to order that a bill of particulars be filed, and the court will not arrest the judgment after verdict where he attempts to reserve his fire until he takes first the chance of acquittal. . . .

-41-

With such safeguards thrown around prosecutions, it must be the fault of the person charged if he goes to trial without being 'informed of the accusation against him.' ").

An indictment might fail to satisfy constitutional purposes by failing to provide "notice sufficient to prepare a defense and to protect against double jeopardy," *Lancaster*, 385 N.C. at 462 (quoting *In re J.U.*, 384 N.C. at 623), or it might fail to satisfy relevant statutory strictures by failing to "assert[ ] facts supporting every element of a criminal offense." N.C.G.S. § 15A-924(a)(5). However, because these deficiencies do not implicate modern jurisdictional concerns, the analytical framework that mandated reflexive vacatur of convictions and dismissal of charges if the indictment contained either a statutory or constitutional defect is inappropriate. As these species of errors in a charging document are not jurisdictional, a defendant seeking relief must demonstrate not only that such an error occurred, but also that such error was prejudicial. *See State v. Alston*, 307 N.C. 321, 339 (1983) ("The defendant is not entitled to a new trial based on trial errors unless such errors were material and prejudicial.").

In determining whether an error was prejudicial, the prejudicial error tests provided in section 15A-1443 are applicable.[16] Subsection 15A-1443(a) is the appropriate test for indictment errors that fail to satisfy statutory strictures, and

---

[16] Because a pleading error is not an evidentiary or instructional error, plain error review is not appropriate. In addition, given the availability of discovery and mechanisms such as motions for a bill of particulars, it is difficult to imagine pleading errors could satisfy the prejudice prong.

subsection 15A-1443(b) is the appropriate test for indictment errors that fail to satisfy the constitutional purposes of indictments.[17]   *See* N.C.G.S. § 15A-1443 (2023). However, it would appear that the longer a defendant waits to raise issues related to deficient criminal pleadings, the more difficult it would be to establish prejudice.[18]

## B. Sufficiency of the Short-Form Indictment

Having determined that an indictment charging a defendant with violating the laws of this State is sufficient to invoke the superior court's jurisdiction without regard to an indictment's statutory or constitutional infirmities, we turn to the State's argument that the Court of Appeals erred in concluding the indictment charging defendant with second-degree rape was defective.

---

[17] While our precedent on this issue may inform our judgment, we understand that whether subsection 15A-1443(c) may be relevant where, as here, the defendant fails to either object to the allegedly erroneous indictment or file a motion for a bill of particulars, is a question that will need to be addressed in future cases. A defendant who alleges that an indictment failed to provide sufficient notice to prepare a defense may have a more compelling argument that his counsel provided ineffective assistance. *See State v. Reber*, No. 138A23, slip. op. at 20 (N.C. May 23, 2024) ("[W]henever these claims exist on direct appeal, there will be a corresponding claim of ineffective assistance of counsel that can be pursued in a motion for appropriate relief. . . . [A]n ineffective assistance claim brought in a motion for appropriate relief avoids the gamesmanship concern . . .; it provides a forum where a fact-finder can determine whether the failure to object was indeed a reasonable strategic decision, or instead a deficiency on the part of counsel.").

[18] Contrary to the hyperbole in the opinion of our dissenting colleague, treating alleged indictment deficiencies in the same manner as other errors does not reveal that this Court has a "thin view of justice" or an "even thinner view of due process." If requiring a defendant to demonstrate prejudice in this context is an attack on due process, why is it permissible when this Court reviews other alleged constitutional violations? Notably, and unlike alleged indictment defects, other alleged constitutional errors require a defendant to properly preserve them for appellate review—yet that concept has never been lambasted for eroding constitutional protections. In noting that a defendant faces an increasingly difficult challenge attempting to demonstrate prejudice the longer he delays raising the issue, we are offering practical guidance, not establishing a bright-line rule.

Recently, this Court unanimously noted that

> the General Assembly's adoption of the Criminal Procedure
> Act represented a sharp departure from the demands of
> technical pleading. . . .
>
> Since adoption of the Act, this Court has been consistent in
> retreating from the highly technical, archaic common law
> pleading requirements which promoted form over
> substance. Instead, contemporary criminal pleading
> requirements have been designed to remove from our law
> unnecessary technicalities which tend to obstruct justice.

*Lancaster*, 385 N.C. at 462–63 (cleaned up).

The elements of second-degree rape that the State must prove at trial are that

the defendant (1) engaged in vaginal intercourse, (2) with a victim who was mentally

incapacitated or physically helpless, and (3) knew or reasonably should have known

that the victim was mentally incapacitated or physically helpless. N.C.G.S. § 14-

27.22 (2023). Proof necessary for conviction, however, is far different from what is

required to indict a defendant, as we have discussed above.

A short-form indictment for second-degree rape of a mentally incapacitated or

physically helpless individual satisfies statutory requirements if it

> allege[s] that the defendant unlawfully, willfully, and
> feloniously did carnally know and abuse a person . . . who
> was mentally incapacitated or physically helpless, nam[es]
> the victim, and conclude[es] as required by law.

N.C.G.S. § 15-144.1(c) (2023). Notably absent from this language is any requirement

that the indictment assert the accused knew or reasonably should have known that

the victim was mentally incapacitated or physically helpless. Here, the indictment

charging defendant with second-degree rape alleged that defendant

> unlawfully, willfully, and feloniously did engage in vaginal intercourse with [Jane], who was at the time, physically helpless. This act was done in violation of NCGS § 14-27.22.

Defendant did not object to this indictment before or during his trial. However, he now argues that the indictment is fatally defective because it used the phrase "did engage in vaginal intercourse with [a person]" rather than "did carnally know and abuse a person," and thereby "failed to allege one of the essential elements; namely, that [defendant] knew or reasonably should have known that Jane was physically helpless when he engaged in sexual intercourse with her." *Singleton*, 285 N.C. App. at 632.

The Court of Appeals agreed with defendant, holding that "[w]hile the phrase used in the indictment is a sufficient substitute for 'carnally know,' it is not a sufficient substitute for the word 'abuse,' " *id.* at 634, and concluding the indictment was fatally defective because "[t]he verb 'abuse' (or some equivalent) is required as a means of describing the essential element . . . that [d]efendant 'knew or reasonably should have known' that Jane was physically helpless." *Id.* This reasoning is contrary to this Court's precedent and the principle that "it would not favor justice to allow [a] defendant to escape merited punishment upon a minor matter of form." *Sturdivant*, 304 N.C. at 311. This Court has consistently affirmed the legislature's authority to "relieve the State of the common law requirement that every element of the offense be alleged," *Lowe*, 295 N.C. at 603, which is precisely how the short-form

statute at issue here operates.

A plain reading of section 15-144.1(c) demonstrates that the indictment here clearly alleged a crime and was not required to allege actual or constructive knowledge of the victim's physical helplessness. Certainly, such knowledge is an element of the offense and must be proven at trial, but the purpose of short-form indictments is to "relieve the State of the common law requirement that every element of the offense be *alleged*." *Lowe*, 295 N.C. at 603 (emphasis added). In other words, while there is a knowledge element necessary to sustain a conviction at trial, that element is not required to be alleged in the indictment. It cannot reasonably be said that this indictment deprived defendant of notice of the charge such that he could not prepare a defense, or that the court could not enter judgment. The Court of Appeals erred by concluding that the short-form indictment was deficient.

In addition to erroneously searching the indictment language for recitations not required in the short-form statute, the Court of Appeals also appears to have required that the indictment language mirror the short-form statute verbatim. Despite recognizing that this Court "has held that an indictment is not necessarily fatal if its language does not use the precise language of a statute allowing for short form indictment language," the Court of Appeals nevertheless concluded the indictment was defective because the indictment used the phrase "engaged in vaginal intercourse" rather than "carnally kn[e]w and abuse[d]." *Singleton*, 285 N.C. App. at 634.

While this Court has not yet addressed the exact language at issue in this case, our precedent demonstrates that we are loath to invalidate an indictment that communicates the information required by a short-form statute merely because it does so by employing modern language. *See State v. Newborn*, 384 N.C. 656, 661 (2023) ("Applying the principle of substance over form, it is clear that the indictment here gave defendant sufficient notice of the crimes with which he was being charged such that he was able to prepare his defense."); *State v. Tart*, 372 N.C. 73, 79 (2019) (upholding attempted first-degree murder indictment because, despite linguistic difference from relevant short-form statute, indictment nevertheless "serve[d] its functional purposes with regard to both the defendant and the court."); *State v. Wallace*, 351 N.C. 481, 505 (2000) (citing N.C.G.S. § 15-144.1) (holding that indictments "complied with the statutes authorizing short-form indictments for rape and sexual offense" despite their use of the phrases "engage[d] in vaginal intercourse" and "engage[d] in a sexual act" instead of the relevant short-form statute's phrases "ravish and carnally know" and "carnally know and abuse.").[19]

Accordingly, we conclude that the indictment at issue here was not deficient.

_____

[19] The few states that have addressed this specific issue have rejected any argument that the phrase "engaged in sexual intercourse" is an insufficient substitute for the phrase "carnally knew and abused." *See State v. Cunday*, 356 P.2d 609, 611 (Wash. 1960) (holding that "carnally know and abuse" should be construed as "the equivalent of 'sexual intercourse'"); *State v. Sebastian*, 69 A. 1054, 1057 (Conn. 1908) ("Unlawful carnal knowledge certainly includes what is meant by carnal abuse, if it be not synonymous with that.").

Because no error occurred, we need not consider the issue of prejudice.

## III.    Conclusion

For over two hundred years, we have struggled with lingering notions that the common law controls our indictment jurisprudence. Our legislature has consistently and completely taken action to eliminate these "shadowy nothings" that impede justice and erode the public's confidence in our system. Judges and lawyers, however, have been unwilling to give up these technicalities that permit defendants to escape merited punishment.

Since 1811, the plain language and the spirit of the law has been to move away from common law pleading requirements in criminal cases that were overwrought with technicalities. As we recognized in 1898, we reiterate that "[t]he practical sense of the age demands" that technicalities should not carry the day for defendants who argue form over substance in our indictment jurisprudence, because defendants are seldom prejudiced by mistakes in pleadings. *See Hester*, 122 N.C. at 1050.

Courts lack the ability to act where a criminal indictment suffers from a jurisdictional defect, that is, where it wholly fails to allege a crime against the laws or people of this State. But a mere pleading deficiency in an indictment does not deprive the courts of jurisdiction. The General Assembly abrogated the archaic common law rules concerning criminal pleadings, and the indictment charging defendant with second-degree rape was not deficient.

REVERSED.

Justice EARLS concurring in part and dissenting in part.

I agree with the majority that Mr. Singleton's indictment was not fatally defective. That conclusion should end the case. Both the State and Mr. Singleton concede that reaching the jurisdictional issue is unnecessary if we find no fatal variance in the indictment.[1] We so find, and a court with any respect for judicial restraint would stop there.

The majority, however, goes further. Although every member of this Court agrees that Mr. Singleton's indictment was not defective and thus did not divest the trial court of jurisdiction, the majority opines that virtually no indictment will *ever* meet that threshold. In a sprawling ruling—largely dicta because it is unnecessary to the holding—the majority upends centuries of precedent and announces its view that constitutional and statutory defects in an indictment are non-jurisdictional. This

---

[1] At oral argument, counsel for the State affirmed that this Court need only reach the jurisdictional issue if it concluded that Mr. Singleton's indictment was fatally defective. Oral Argument at 11:58, State v. Singleton (No. 318PA22) (Sept. 19, 2023), https://www.youtube.com/watch?v=zNCACKHqBlg&t=2279s (last visited May 17, 2024). The State framed its position as an "alternative argument," one only relevant to the merits if this Court rejected its first. *Id.* at 12:05. "If this Court were to find that this indictment as written is defective, the State would nonetheless ask that this Court affirm the judgment of the trial court, reverse [the judgment of] the Court of Appeals below, on the basis that the rule that indictments give jurisdiction is an outdated and obsolete rule." *Id.* at 12:11. Defense counsel argued the same. "Mr. Singleton argues today that the State's challenge to the jurisdictional remedy is not within the scope of review. At the Court of Appeals, the State did not raise the issue of a challenge to the jurisdictional remedy, the Court of Appeals opinion was unanimous, and so that puts us—I think—into Rule 16(a) which would require the State to raise the issue in the PDR and in the new briefs. And the State did raise the issue in the new briefs, but not in the PDR. And so I would argue that it's not properly before the Court." *Id.* at 37:24.

is not originalism, constitutional conservatism, or respect for stare decisis. *Cf. State v. Robinson*, 375 N.C. 173, 193 (2020) (Newby, J., dissenting) ("As a monarch, King Louis XVI once famously said, '*C'est légal, parce que je le veux*' ('It is legal because it is my will.'). Today, four justices of this Court adopt the same approach to the law, violating the norms of appellate review and disregarding or distorting precedent as necessary to reach their desired result. Apparently, in their view, the law is whatever they say it is."). Rather than wait for a case that presents the issue, the majority fashions its own vehicle to rewrite law that has stood for over two centuries. *Cf. id.* at 195 ("Instead of doing the legally correct thing, the majority opinion picks its preferred destination and reshapes the law to get there.").

An indictment "is a written accusation of an offense, preferred and presented upon oath as true by a grand jury at the suit of the government." *State v. Morris*, 104 N.C. 837, 839 (1889). In effect, an indictment is the catalyst of a criminal trial. It marks the start of the State's formal prosecution and alerts the defendant and the presiding court of the accusations. *See McClure v. State*, 267 N.C. 212 (1966).

Before today, this Court held that indictments were jurisdictional. In other words, that "a valid indictment is required for a court to retain jurisdiction." *State v. Rankin*, 371 N.C. 885, 897 (2018). That rule flowed from and recognized the important functions an indictment performs—a "valid indictment, among other things, serves to identify the offense being charged with certainty, to enable the accused to prepare for trial, and to enable the court, upon conviction, to pronounce

the sentence." *Id.* at 886 (cleaned up) (quoting *State v. Saults*, 294 N.C. 722, 726 (1978)). We thus examined an indictment to ensure that it alleged the indispensable elements of the charged crime and "fulfill[ed] its constitutional purposes—to identify clearly the crime being charged, thereby putting the accused on reasonable notice to defend against it and prepare for trial, and to protect the accused from being jeopardized by the State more than once for the same crime." *State v. White*, 372 N.C. 248, 250 (2019) (cleaned up).

An indictment was fatally defective if it omitted "some essential and necessary element of the offense" or fell short of constitutionally required notice. *See State v. Ellis*, 368 N.C. 342, 344 (2015) (cleaned up). An indictment so flawed effectively failed to charge a crime, and its allegations were so amorphous that they did not protect against double jeopardy or prepare the defendant for trial. *See Rankin*, 371 N.C. at 895 ("The indictment in this case failed to allege each element of the crime of littering, thereby depriving defendant of sufficient notice."). Because an indictment initiates a criminal trial, a defective indictment yields defective proceedings. Any resulting conviction or sentence was viewed by this Court as premised on and poisoned by that original sin. *Id.* at 886–87; *see also State v. Campbell*, 368 N.C. 83, 86 (2015).

Faced with a fatally flawed charging instrument, the remedy was to vacate any conviction born of it. *See Campbell*, 368 N.C. at 86 ("A defendant can challenge the facial validity of an indictment at any time, and a conviction based on an invalid indictment must be vacated."). Because the State cannot punish its citizens but

through proper legal course, the courts—exercising the State's sovereign judicial authority—cannot try, convict, and sentence a defendant but through lawful process. Thus, when an indictment failed to charge a crime or breached basic tenets of due process, we declined to grant legal force to the fruits of that procedural failure. *See Rankin*, 371 N.C. at 895. In the eyes of the law, the court imposing that judgment lacked the power to do so in contravention of the defendant's rights. *See State v. Whedbee*, 152 N.C. 770, 776 (1910) ("It will not do to say in this land of freedom, where the rights of every citizen are carefully guarded and preserved, that a man should be convicted. He must be convicted, if at all, according to the law, and in that way only.").

That rule—drawn from the common law—declared indictments "jurisdictional." *See, e.g., State v. Simpson*, 302 N.C. 613, 616 (1981) ("[A] valid bill of indictment is essential to the jurisdiction of the court to try defendant for a felony."); *State v. Mostafavi*, 370 N.C. 681, 684 (2018) (observing that "a valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony" (quoting *State v. Sturdivant*, 304 N.C. 293, 308 (1981))). We did not vacate convictions for minor technical hitches, as the majority frames it. Instead, we reserved that relief for indictments with fatal constitutional or statutory flaws, documents missing "indispensable allegation[s] of the charge" or failing of their constitutional purposes. *See Rankin*, 317 N.C. at 887 (quoting *State v. Russell*, 282 N.C. 240, 245 (1972)). In those cases—rare indeed—we declined to honor the legal force of the conviction because it was premised on fatally defective process.

Under today's ruling, however, a constitutionally or statutorily defective indictment is not enough to merit relief. A defendant must also show prejudice—that is, harm *on top of* the State's procedural violation. Or to be exact, a defendant can allege prejudice; as the majority makes clear, that hurdle promises to be all-but-insurmountable.

I think that decision is profoundly misguided. On the law, the majority is wrong—time and again, this Court has rooted the remedy for a defective indictment in fundamental constitutional protections and the statutory provisions realizing them. On logic, there is little—the majority reaches its result by blurring lines and cutting corners. Most regrettably, today's decision rests on a thin view of justice and an even thinner view of due process. Flawed indictments, the majority insists, are mere technicalities used by guilty defendants to escape merited punishment.

I take a different view. Requiring the State to properly charge a citizen with a crime before marshalling its immense power against them is "properly characterized as [a] constitutional procedural due process protection[ ]." *See In re J.U.*, 384 N.C. 618, 630 (2023) (Earls, J., dissenting). When the State fails to indict a defendant in line with constitutional and statutory guardrails, vacating that conviction is the only remedy that vindicates those legal safeguards and the precious values they protect. Because the majority removes those principled due process restraints on State power, I dissent.

## I.    The Nexus Between Indictments and Jurisdiction

At its most basic, "jurisdiction" refers to the "legal power and authority of a court to make a decision that binds the parties to any matter properly brought before it." *See In re T.R.P.*, 360 N.C. 588, 590 (2006) (quoting *Judicial Jurisdiction, Black's Law Dictionary* (7th ed. 1999)). To act, a court must have jurisdiction over the parties before it and the subject matter involved. *See id.* As we have explained, jurisdiction is the "indispensable foundation upon which valid judicial decisions rest." *Id.* Without it, a court "has no power to act." *Id.* And when a court proceeds without jurisdiction— when it lacks the power to decide the case before it—any decision it renders is, in the eyes of the law, a nullity. *See id.*; *see also Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) ("A universal principle as old as the law is that the proceedings of a court without jurisdiction of the subject matter are a nullity."). It has no binding effect or legal force. *See In re T.R.P.*, 360 N.C. at 590. No legal "rights are acquired or divested by it." *Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 90 (1956) (quoting *Stafford v. Gallops*, 123 N.C. 19, 21 (1898)). And all "proceedings founded upon it are worthless." *Id.* (quoting *Stafford*, 123 N.C. at 22).

Jurisdiction is not just an abstract concept—it is integral to procedural due process. *See State v. Smith*, 265 N.C. 173, 180 (1965). Procedural due process is, in essence, a "guarantee of fair procedure." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). It means "notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a competent and impartial tribunal *having jurisdiction of the cause.*" *Simeon v. Hardin*, 339 N.C. 358, 377 (1994)

(cleaned up) (emphasis added). In other words, due process restricts the State from depriving a person of life, liberty, and property except through duly authorized judicial proceedings by a court with the authority to act.

In criminal cases, this Court has long linked indictments to jurisdiction. *See State v. Whedbee*, 152 N.C. 770 (1910); *State v. Snipes*, 185 N.C. 743 (1923); *State v. Nugent*, 243 N.C. 100 (1955). That nexus, we have explained, flows from North Carolina's Constitution itself. *See, e.g., State v. Snyder*, 343 N.C. 61, 65 (1996) ("Jurisdiction to try an accused for a felony depends upon a valid bill of indictment guaranteed by Article I, Section 22 of the North Carolina Constitution."). Before the State may deploy its immense power to strip a person of their freedom, it must, at a minimum, properly charge and notify him of his alleged crimes. To do so, the "public prosecuting attorney" must draw up "a written accusation of a crime"—the indictment. *State v. Thomas*, 236 N.C. 454, 457–58 (1952). That document must allege "lucidly and accurately all the essential elements of the offense endeavored to be charged." *State v. Greer*, 238 N.C. 325, 327 (1953). Once the indictment is "submitted to the grand jury, and by them found and presented on oath or affirmation as a true bill," the State may bring the case before a criminal court. *Thomas*, 236 N.C. at 457.

Our precedent has labelled a valid indictment an "essential of jurisdiction." *See State v. McBane*, 276 N.C. 60, 65 (1969). As the majority notes, the word "jurisdiction" has sparked some confusion, as the common law terminology is not coincident with

modern notions of that term. "Jurisdictional remedy" supplies a better descriptor of the common law rule. *See Rankin*, 371 N.C. at 895 (discussing the "common law rule that a defective indictment deprives a criminal court of jurisdiction" interchangeably with the "common law remedy for invalid indictments"). It captures the idea that a conviction secured at the expense of procedural protections should, on review, be divested of legal force. Our precedent has indeed embraced that principle, casting the jurisdictional remedy as a recognition that tainted criminal judgments must yield to the safeguards afforded to the accused. *See, e.g., McClure v. State*, 267 N.C. 212, 215 (1966) ("There can be no trial, conviction, or punishment for a crime without a formal and sufficient accusation. In the absence of an accusation the court acquires no jurisdiction whatever, and if it assumes jurisdiction a trial and conviction are a nullity." (cleaned up)).

## A. Proper Exercise of Judicial Power

On one level, the jurisdictional remedy reflects bedrock ideas of the proper role and function of courts. A criminal court—just like any other court—cannot act without a proper invocation of its rightful authority. *See In re T.R.P.*, 360 N.C. at 590. The indictment serves that function in criminal cases, much like service of process in civil suits. When the State indicts a defendant for a crime, it equips the court to adjudicate specific allegations of criminal conduct within the contours of the adversarial system. *See State v. Albarty*, 238 N.C. 130, 131 (1953) ("The first rule of good pleading in criminal cases is that the indictment or other accusation must

inform the court and the accused with certainty as to the exact crime the accused is alleged to have committed.").

It is thus vital that the State charge a defendant with the essential elements of a crime—or at the very least, "provide[ ] such certainty in the statement of the accusation as would identify the offense with which defendant was charged" and "enable[ ] defendant to prepare for trial." *State v. Tart*, 372 N.C. 73, 79 (2019) (citing *Greer*, 238 N.C. at 327). If an indictment falls short of statutory or constitutional benchmarks, the presiding court lacks jurisdiction over the defendant's case. The State's failure to properly notify the defendant of the accusations means that the court cannot, in compliance with due process, "bring [him] into its adjudicative process." *See In re T.R.P.*, 360 N.C. at 590 (cleaned up); *see State v. Phelps*, 65 N.C. 450, 451–52 (1871) ("The indictment must show on its face that it has been found by competent authority, in accordance with the requirements of law and that a particular person mentioned therein[ ] has done within the jurisdiction of the indictors such and such specific acts, at a specific time, which acts, so done, constitute what the Court can see, as a question of law, to be a crime." (cleaned up)). And an indictment that omits essential elements of an offense or is too vague to "apprise the defendant with reasonable certainty" of the accusation does not, in effect, charge a crime. *See White*, 372 N.C. at 251 (cleaned up). That shortcoming goes to subject-matter jurisdiction, as a court presented with such a threadbare charging instrument has no criminal conduct that it may properly adjudicate. *See State v. Ballangee*, 191

N.C. 700, 702 (1926) (explaining that a court "cannot properly give judgment unless it appears in the record that an offense is sufficiently charged" (quoting *State v. Watkins*, 101 N.C. 702, 703 (1888))); *State v. Hathcock*, 29 N.C. (7 Ired.) 52, 54 (1846) ("[I]n order to bring a trespass within the criminal jurisdiction of the court it must appear on the face of the indictment to amount to a violation of the criminal law.").

For that reason, a defective indictment divests a criminal court of the power to act—it jeopardizes the court's legal authority to bind the parties to its judgment and resolve the case before it. *See Albarty*, 283 N.C. at 133. And so if that court tries, convicts, and sentences a defendant, its actions are void because they stray outside the court's lawful power. *See State v. Yoes*, 271 N.C. 616, 630 (1969) ("It is axiomatic that a trial of an accused person in a court which has no jurisdiction of the matter cannot result in a valid determination of his guilt or innocence of the offense with which he is charged. Consequently, a judgment rendered by such court is void and, upon appeal, must be vacated irrespective of the sufficiency of the evidence presented in the trial court to establish the guilt of the accused.").

## B. Constitutional Guarantee and Bulwark of Due Process

But valid indictments are jurisdictional for still more fundamental reasons. For one, they are inscribed in our Constitution—proceedings built on invalid indictments are thus built on a deprivation of constitutional rights. From the first, our Constitution has guaranteed that "no person shall be put to answer any criminal charge but by indictment." N.C. Const. art. I, § 22. So, too, does it afford "every person

charged with crime" the right "to be informed of the accusation" against him. N.C. Const. art. I, § 23. That "constitutional guarantee is a substantial redeclaration of the common law rule" requiring the State to include in an indictment the key elements of the alleged offense. *Nugent*, 243 N.C. at 101. Though simple in language, those constitutional protections are profound in meaning. They reflect the framers' distrust of untrammeled State power and their intentional construction of procedural guardrails. *Thomas*, 236 N.C. at 457. When they met "at Halifax in 1776 to frame a [C]onstitution for the newly born state" of North Carolina, the framers "knew how grossly the English Crown had abused its legal power to prosecute its subjects upon informations preferred by its prosecuting attorneys without the intervention of a grand jury." *Id.* The constitutional right to an indictment sprang from the framers' desire to "forestall like abuses of criminal accusations in the infant commonwealth." *Id.*

That safeguard, alongside the guarantee of notice, is "one of the chief glories of the administration of the criminal law in our courts." *State v. Barnes*, 253 N.C. 711, 714 (1961). As we have explained, those protections "are in strict accord with our inherited and traditional notions of fair play and substantial justice." *Id.* (cleaned up). They are "dear to every free man," we have continued—they serve as "his shield and buckler against wrong and oppression." *Snipes*, 185 N.C. at 748 (quoting *State v. Moss*, 47 N.C. (2 Jones) 66, 68 (1854)). And again, those protections are "fundamental," and they "lie at the foundation of civil liberty." *Moss*, 47 N.C. (2 Jones)

at 68. To vigorously protect them is "nothing but right and just." *Whedbee*, 152 N.C. at 774. A rule straying from them "would be clearly oppressive, if not cruel, in its operation." *Id.* For that reason, we have labelled that safeguard as "a substantial right that may not be ignored, and not a mere technical or formal right." *Nugent*, 243 N.C. at 101. Since defendants have a constitutionally enshrined right to a valid indictment, the absence of that safeguard disempowers the presiding court, as proceedings and judgments rendered in contravention of that right must yield to constitutional guarantees.

Not only is the right to an indictment a freestanding constitutional protection, but it is also integral to due process. As this Court has explained, a valid indictment breathes life into the other protections afforded to the accused and is vital to fair and accurate proceedings. The indictment is the mechanism through which a defendant is "informed of the accusation" against him. *See Sturdivant*, 304 N.C. at 309 (explaining that "notice of the nature of a criminal accusation is a necessary corollary to the jurisdictional requirement of an indictment in capital cases" and explaining that "[t]his constitutional mandate" grants "a defendant the right to be charged by a lucid prosecutive statement which factually particularizes the essential elements of the specified offense"). Only by learning of the charges brought by the State can a defendant and his counsel meaningfully respond. *See Rankin*, 371 N.C. at 886. Lucid allegations in an indictment are thus "required to enable the defendant to meet the charge and prepare for his defense." *State v. Gallimore*, 272 N.C. 528, 533 (1968)

(quoting *State v. Van Pelt*, 136 N.C. 633, 639 (1904)). On a strategic level, too, they equip a defendant to identify and challenge legal flaws in the State's case. *See State v. Tisdale*, 145 N.C. 422 (1907). A valid indictment is also vital to a defendant's decision about *how* to proceed—whether he elects to plead or take the case to trial. *See Van Pelt*, 136 N.C. at 640 ("The accused has therefore the right to have a specification of the charge against him in this respect, in order that he may decide whether he should present his defense by motion to quash, demurrer or plea; and the Court, that it may determine whether the facts will sustain the indictment." (cleaned up)); *accord State v. Faucett*, 20 N.C. (4 Dev. & Bat.) 239 (1838).

In the same vein, an indictment allows the presiding court to examine and ensure that the State has charged the defendant for an actual crime. *See Whedbee*, 152 N.C. at 774 ("The indictment must be so drawn and the facts so stated therein that this Court can see upon its face that an offense has been committed, if the evidence corresponds with and supports the allegations of the bill."). And though indictments are returned before trial, they bear on the trial itself. Requiring an indictment to contain "reasonably definite and certain" charges furnishes a "necessary safeguard to the accused against surprise, misconception and error in conducting his defense." *Van Pelt*, 136 N.C. at 640 (cleaned up); *accord Faucett*, 20 N.C. (4 Dev. & Bat.) at 239. It also provides a guardrail on the scope of potential criminal liability, as "a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment." *State v. Jackson*, 218 N.C. 373,

376 (1940).

If a defendant is adjudged guilty, the indictment also shapes his punishment. It "enable[s] the court, on conviction or plea of *nolo contendere* or guilty to pronounce sentence according to the rights of the case." *Greer*, 238 N.C. at 327; *see also State v. Jesse*, 19 N.C. (2 Dev. & Bat.) 297, 300 (1937) (explaining that the indictment needed to properly charge a felony, as that necessary language "determines the privileges of the accused on his trial, and the degree and consequences of the punishment"); *see also State v. Battle*, 130 N.C. 655 (1902); *Nugent*, 243 N.C. at 101 ("[R]equiring the charge against the defendant to be set out in the warrant or indictment with such exactness . . . can enable the court, on conviction, to pronounce sentence according to law."); *Apprendi v. New Jersey*, 530 U.S. 466, 478–80 (2000) (explaining historical linkage between indictments and criminal punishment and stating that "after verdict, and barring a defect in the indictment, pardon, or benefit of clergy, 'the court must pronounce that judgment, which the law hath annexed to the crime' " (quoting 4 Blackstone 369–70)).

An indictment even retains legal import after proceedings end. In "case of an acquittal or conviction," the indictment allows a defendant "to show by the record the identity of the charge, so that he may not be indicted a second time for the same offense." *Gallimore*, 272 N.C. at 533 (quoting *Van Pelt*, 136 N.C. at 639). An indictment thus goes hand in hand with another constitutional guarantee: that "no person may be twice put in jeopardy of life or limb for the same offense." *State v.*

*Rambert*, 341 N.C. 173, 175 (1995). That "fundamental feature of our legal system"—commonly known as double jeopardy—protects defendants by "providing repose," "eliminating unwarranted embarrassment, expense, and anxiety," and "limiting the potential for government harassment." *State v. Brunson*, 327 N.C. 244, 249 (1990).

And so when an indictment is fatally defective—when it fails of its essential and constitutionally prescribed purposes—that defect defangs the legal weight of any criminal judgment imposed by the court. *See Nugent*, 243 N.C. at 101. Whatever semantic murkiness over the term "jurisdiction," the guiding intuition of the common law remedy was clear: When the State ignores constitutional protections and sidesteps due process, any resultant conviction flows from a breach of the defendant's constitutional rights. *See Rankin*, 371 N.C. at 895. That judgment should not be given legal force.

## II.    Flaws in the Majority's Reasoning

Until today, that was where our law stood. But the majority now reverses course. It announces that when the State fails to properly indict a defendant for a crime, that error does not affect a court's power to try, convict, and sentence that defendant. Statutory and constitutional errors in the foundational charging instrument are, according to the majority, mere superficial problems with little practical impact. That holding defies core principles of due process and centuries of precedent. It is also analytically and legally flawed.

## A.  Merging Separate Elements of the Common Law

To reach its result, the majority starts by collapsing discrete facets of the common law into a monolithic boogeyman. To be exact, the majority conflates the common law's exacting requirements for a valid indictment with the remedy for a defective indictment. Those are distinct issues. Just as diagnosing a disease is different than treating it, defining a defective indictment is different than remedying a concededly faulty one.

This Court has taken separate paths on those discrete spheres of the common law. On the substantive requirements of a valid indictment, we have retreated from the stringent common law standard. *See, e.g., Campbell*, 368 N.C. at 86; *accord State v. Wallace*, 351 N.C. 481, 507 (2000). We have thus allowed the General Assembly to enact short form indictments by statute. *State v. Randolph*, 312 N.C. 198, 210 (1984); *State v. Lowe*, 295 N.C. 596, 604 (1978). And we have disclaimed the need for an indictment to contain "magic words," focusing instead on whether the substance of the document tracks the essential elements of the charged offense. *See, e.g., State v. Hunter*, 299 N.C. 29, 41 (1980) ("[T]here is no requirement that an indictment must follow the precise language of the statute provided that the pleading charges facts which are sufficient to enable the indictment to fulfill its essential purposes.") So in recent years—unlike at common law—an indictment need not be flawless to pass muster. *See Rankin*, 371 N.C. at 887 ("The law disfavors application of rigid and technical rules to indictments; so long as an indictment adequately expresses the charge against the defendant, it will not be quashed."). Instead, a defective charging

instrument imperils a court's jurisdiction only if it is "fatally defective"—that is, if it omits an "essential element" or "indispensable allegation" of the charged offense. *See id.* at 886–87.

But the remedy for an indictment adjudged invalid is a different issue. Though we have adjusted our rubric for identifying when an indictment is defective, we have retained the remedy when an indictment satisfies that test. *See id.* Put another way, though we have altered how we diagnose a disease, once identified, the cure for that ailment has stayed the same. Even under the more lax modern approach, we recognized that a "fatally defective" indictment effectively failed to charge a crime and fell short of its constitutional aims. *See, e.g., State v. Wagner*, 356 N.C. 599, 601 (2002) (per curiam). The remedy prescribed by the common law—and until today employed by this Court—was to vacate the conviction and treat it as beyond the court's lawful authority. *See State v. Vestal*, 281 N.C. 517, 520 (1972). Put simply, we declined to grant legal force to a conviction built on such a faulty foundation. *See McClure,* 267 N.C. at 215–16.

The majority, however, swaps analytical precision for a soaring condemnation of the "common law" as a whole. It collapses the common law's substantive requirements with the remedy employed for defective indictments, functionally treating the common law as a singular mass without disaggregating its discrete doctrinal parts.

**B. Misguided Forray Through History**

Building on that analytical error, the majority retrofits history and precedent to align with its preferred result. It seems to argue that the legislature abolished the common law remedy—probably in 1811, almost assuredly by 1853, and without question by 1975. That would come as a surprise to the scores of cases and dozens of jurists who have interpreted the same statutes as the majority but reached the opposite result. For we now learn that the majority's position has actually been the law for over 200 years! This Court's decisions have apparently been wrong—for two centuries, no less. The majority's analysis, however, does not justify its sweeping denunciation of its predecessors.

Take for instance, the majority's invocation of N.C.G.S. § 15-153. That provision—first enacted in 1811 and still in effect, though with minor tweaks—disclaims courts from setting aside a conviction based on "informalities or refinements" in an indictment, so long as its substantive allegations are enough to "induce [the court] to proceed to judgment." *See* Potter's Revisal of 1819, Laws of 1811, Ch. 809. According to the majority, section 15-153—"[w]hen read alone or in *pari materia* with N.C.G.S. 15-155"—ended the "formalistic practice of the common law," "except where no crime at all was charged." In one sense, the majority is right. Section 15-153, as this Court has explained, "abolished the requirement that the detailed particulars of a crime must be stated in the meticulous manner prescribed by the common law." *Nugent*, 243 N.C. at 101. Even so, "the requirement remains that in every prosecution by warrant or indictment the defendant shall be informed of the

accusation against him, and this accusation must be set forth with sufficient certainty for the purposes" embedded in the Constitution. *Id.*

In other words, though the statute loosened the common law requirements for what a valid indictment must allege, it still retained a substantive baseline. *See State v. Tarlton*, 208 N.C. 734, 736–37 (1935); *State v. Gibbs*, 234 N.C. 259, 261 (1951) ("We have not overlooked G.S. 15-153, which provides that an indictment shall not be quashed by reason of a mere 'informality or refinement.' This statute, however, does not dispense with the requirement that the essential elements of an offense must be charged, and many decisions of this Court have so held."). Most importantly, the statute did not jettison the remedy for an indictment that fell below its already-relaxed standard. After section 15-153's enactment—as before—this Court vacated a conviction based on an indictment that lacked a "distinct averment of any fact or circumstance which is an essential constituent of the offense charged." *State v. Cole*, 202 N.C. 592, 598 (1932); *see also McBane*, 276 N.C. at 65 (vacating conviction because indictment was defective and explaining that "[n]othing in G.S. 15-153 or in G.S. 15-155 dispenses with the requirement that the essential elements of the offense must be charged").

The majority's analysis of other statutes is equally unconvincing. It next cites N.C.G.S. § 15-155, another provision that patched technical defects in an indictment. By its text, however, that statute cuts against the majority's conclusion—it disclaims quashing of indictments if "the court shall appear by the indictment to have had

*jurisdiction of the offense.*" N.C.G.S. § 15-155 (2023). If the legislature intended to uproot all traces of the common law jurisdictional rule, as the majority holds, it is odd indeed to enact a statute reifying the link between indictments and jurisdiction. Unsurprisingly then, this Court has previously read the provision differently than does the majority, "confin[ing]" section 15-155 "to formal objections." *State v. Wise*, 66 N.C. 120, 124 (1872). The statute, we have explained, was "intended only to cure formal defects, after conviction, so that the guilty should not go 'unwhipt of justice,' and evade punishment on technical objections." *Id.* It did not, however, excuse indictments with "a vital defect" which "could not be cured, unless the Court is to give judgment in the dark." *Id.* So yet again, the majority wrings from a statute a far different—and far broader—rule than our precedent prescribes.

Lastly, the majority clings to the Criminal Procedure Act of 1975 (CPA)—a broad-based statutory reform that retooled many facets of criminal procedure in our state. If there is "any doubt regarding the continued application of the common law's technical requirements," the majority insists, then the CPA dispelled them. Through that statute, the majority continues, the legislature "removed any vestiges of the archaic, hyper-technical common law requirement that a valid indictment contain a rote recitation of elements." Again, that claim is partially right—this Court has read that statute to further relax the stringent common law standards for a valid indictment. *See State v. Palmer*, 293 N.C. 633, 638 (1977). But again, the majority stretches the CPA past its breaking point, reading it to displace not just the common

law pleading requirements for an indictment, but also the common law remedy for an invalid indictment.

We rejected that very result in *Rankin*, discerning "no unsettled question of whether the common law remedy for invalid indictments was abrogated by the [CPA]." *Rankin*, 371 N.C. at 898. In that case, we canvassed the history, context, and purpose of the statute. *Id.* at 896–98. And we concluded that when it adopted the statutory reforms, the General Assembly neither intended nor acted to supplant the "common law remedy." *Id.* Just the opposite. The legislature "acknowledged and approved" of the common law rule. *Id.* at 897. Its "comprehensive reform" and "detailed commentary included with the codified statutes" showed its careful examination of current criminal procedures. *Id.* The official commentary cited our decisions vacating convictions based on defective indictments and "explicitly endorsed" the "common law remedy for invalid indictments." *Id.* at 898. By its text, too, the CPA barred a court from continuing "criminal prosecution if the indictment fails to charge the defendant with a crime." *Id.* at 897. And "in the decades since the enactment of the [CPA], the common law remedy for invalid indictments has been applied time and again by the appellate courts," with no further intervention by the legislature. *Id.* at 898. We thus held that the "General Assembly, no doubt aware of this practice, has never acted to abrogate this common law rule." *Id.*

The majority tacitly overrules *Rankin*, though its reasoning is murky. It begins by applauding the correctness of its conclusions reached mere paragraphs before.

Because *Rankin* took a different view, the majority deduces, it must necessarily be wrong. That argument only holds if, in fact, the majority's readings of history and precedent are correct. They are not. And repeating those flawed statements does not make them true, any more than insisting that the sky is red makes it anything but blue. We are next told that the dissent in *Rankin* was so "well-reasoned and vigorous" that it displaced the decision of the Court. But in a curious twist, that same dissent disclaimed the historical and legal postulates excavated by the majority today. *See id.* at 909 (Martin, C.J., dissenting) ("Despite its comprehensive nature, though, the [CPA] did not directly address whether indictments that do not meet the Act's statutory standards fail to confer jurisdiction on the court; there is no single provision that explicitly adopts or rejects the common law jurisdictional rule. Compounding this omission is a dearth of cases analyzing whether the [CPA] carried forward or abrogated the common law jurisdictional rule.").

Any confusion is soon resolved, though, as the majority lays bare its real disagreement with *Rankin*. The CPA was geared towards eliminating practices that "frustrate the effective and efficient administration of justice," a goal that—in the majority's view—is "directly contrary" to the common law remedy. Missing, of course, is the legislative evidence that the General Assembly considered and kept that very remedy. *See Rankin*, 371 N.C. at 896–98. But even if the majority is right and the CPA elevates efficiency above all else, a statute cannot buy expedience at the price of constitutional rights. *See Lowe*, 295 N.C. at 603 (affirming the legislature's

"prerogative" to enact statutory short-form indictments "so long as the newly prescribed indictment still complies with the constitutional requirement that the defendant be informed of the accusation against him"). So the General Assembly's efforts to modernize criminal pleadings did not—and cannot—dispense with constitutional guarantees. *State v. Harris*, 145 N.C. 456, 457–58 (1907); *see also State v. Moore*, 104 N.C. 743, 750–51 (1890).

In short, the majority's historical analysis is a masterclass in shadowboxing. It attacks one aspect of the common law rule—its rigid pleading requirements—as grounds to invalidate a different facet of the common law—the proper remedy when a court finds an indictment invalid. It contends that its rule has always been the right one, as proven by this Court's "inconsistent" application of statutory law. But what the majority paints as "vacillations" and "inconsistencies" were, in truth, this Court's efforts to interpret the law with nuance and care. In some cases, we found the indictment sufficient in substance to sustain the conviction. *See, e.g., State v. Murrell*, 370 N.C. 187, 196 (2017); *see also State v. Sossamon*, 259 N.C. 374 (1963). In others, we reached the opposite conclusion. *See, e.g., Palmer*, 293 N.C. 633. But in each case, this Court tread gingerly, respecting the precious rights hanging in the balance and the accreted wisdom of precedent. That caution and restraint find no home in today's decision.

## C. Unworkable and Ill-Founded Distinctions

In its next analytical twist, the majority splits defective indictments into two

camps. An indictment implicates jurisdiction only if it "wholly fails to allege a crime against the laws or people of this State." By contrast, an indictment raises no jurisdictional concerns if it fails "to allege with sufficient precision facts and elements of a crime thereby permitting the defendant to prepare a defense and the court to render judgment." The majority classifies the latter category as "superficial errors" and "mere pleading deficiencies." Those technical hiccups, the majority concludes, have no bearing on a court's power to try, convict, and sentence a defendant.

That artificial bifurcation is riddled with problems. Consider what the Court labels a mere pleading deficiency: the State's failure to charge an essential element of the crime or to provide constitutionally required notice of its accusations against a defendant. In my view, those flaws are far from "superficial"—they are the very reasons why the framers included a constitutional guarantee of indictments. *See State v. Ray*, 92 N.C. 810 (1885) ("The very purpose of the indictment is to inform the accused with certainty and in an intelligent manner, of the offense charged against him. The justice of the law not only requires that he shall be thus informed, but it requires as well, that he shall have reasonable opportunity to prepare to defend himself against the charge."). Forcing the State to apprise citizens of their alleged crimes before arraying its vast power against them is a basic tenet of due process. *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge . . . ."); *see also Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("[A] conviction upon a charge not made . . .

constitutes a denial of due process."). If the State does not properly charge a defendant with a crime—strafing its indictment with piecemeal or amorphous allegations—that deficiency taints the rest of the proceedings, imperiling not just the reliability of the result, but the integrity of the process underlying it. *See State v. Banks*, 263 N.C. 784 (1965); *see also State v. Morgan*, 226 N.C. 414, 415 (1946).

Logically, too, the majority's two-tier regime of jurisdictional defects is difficult to understand. Especially because the majority cites cases recognizing that "where an indictment fails to charge a crime falling within the scope of the court's jurisdiction, the matter is a nullity." In *Rawls*, for instance, we invoked the constitutional guarantee of an indictment in holding that a county court with original jurisdiction over "petty misdemeanors" lacked authority to try the defendant for other types of offenses. *See State v. Rawls*, 203 N.C. 436, 438 (1932). We reached similar decisions in other cases, too. *See, e.g., State v. Wilkes*, 233 N.C. 645, 646–47 (1951) (affirming the quashing of an indictment because the court lacked jurisdiction to try the charged crime); *State v. Harrison*, 126 N.C. 1049, 1049–50 (1900) (same). In each of those cases, the State indicted the defendant for a criminal offense. Under the majority's newly fashioned rule, then, the indictments could not have raised jurisdictional concerns because they did not "wholly fail[ ] to allege a crime against the laws or people of this State." But in each of those cases, as the majority acknowledges, we held that the presiding court lacked the power to try the defendant and bind him to its judgment. *See Rawls*, 203 N.C. at 438; *Wilkes*, 233 N.C. at 646–

47; *Harrison*, 126 N.C. at 1050. That was because the indictments clashed with external legal restraints on the court's power to adjudicate and enforce criminal law. *See Rawls*, 203 N.C. at 438; *Wilkes*, 233 N.C. at 647; *Harrison*, 126 N.C. at 1050. If a court lacks jurisdiction when an indictment charges a crime outside of its sphere of authority, why should a different rule apply when an indictment omits the core elements of a criminal offense or fails to provide constitutionally required notice? In the latter case—just like the former—defects in the charging instrument place the proceedings, from the start, in conflict with legal guardrails and beyond the court's duly vested power. The majority's purported distinction between jurisdictional and non-jurisdictional flaws makes no effort to square its rule with the very precedent it cites.

Finally, the majority's ritual incantation of federal precedent is misplaced. Federal doctrine, unlike state law, is suffused with and guided by federalism concerns and the distribution of authority between the national and state governments. *See United States v. Cotton*, 535 U.S. 625, 629-30 (2002) (tying federal doctrine on indictments to the Supreme Court's evolving federal statutory authority to review criminal convictions and the gradual incorporation of federal constitutional rights). More basically, in North Carolina, the right to an indictment springs from our State Constitution, *see Snyder* 343 N.C. at 65—whatever the federal courts have to say on the topic flows from different analytical and doctrinal roots.

**D. Dislodging Indictments from their Constitutional Footing**

With its two-track conception of indictments in place, the majority decouples indictments from their constitutional mooring. It says that our Constitution offers no support for the "common law rule that indictments are jurisdictional and must allege each element of an offense with precision."[2] The majority makes three arguments on that score.

First, if the jurisdictional remedy flows from defendants' constitutional right to an indictment and notice, *See* N.C. Const. art. I, §§ 22-23, the majority reasons, then short-form indictments must fail. That result, the majority continues, is belied by the legislature's long-standing provision of short-form indictments for select felonies. *See State v. Hunt*, 357 N.C. 257, 267–69 (2003); N.C.G.S. § 15-144 (2023) (homicide); N.C.G.S. § 15-144.1 (2023) (rape); N.C.G.S. § 15-144.2 (2023) (statutory sex offenses). This Court has approved those abbreviated indictments, even though they "relieve the State of the common law requirement" that it detail each element of

---

[2] Note again the majority's commingling of discrete facets of the common law. As explained above, the common law is not a monolith—relevant to this case, its approach to indictments has two moving parts. On one hand is the question of content. That is, the substantive allegations required for a valid indictment. On the other hand is the issue of remedy—the proper relief when a court determines that an indictment falls below substantive baselines. Again, those are separate concepts with different track records. Though the law has *retreated* from the exacting common law requirements for the content alleged in indictments, it has *retained* the common law remedy for concededly defective indictments. *See, e.g., Rankin¸* 371 N.C. at 896-98; *Nugent*, 243 N.C. at 101; *Greer,* 238 N.C. at 326-27; *Cole,* 202 N.C. at 596. The jurisdictional remedy—long employed by this Court—has firm constitutional roots. *See, e.g., Harris*, 145 N.C. at 458; *State v. Bissette*, 250 N.C. 514, 517-18 (1959); *McClure,* 267 N.C. at 215; *Simpson,* 302 N.C. at 616. But in its constitutional discussion, the majority continues its grave analytical error of treating the common law as a singular mass without constituent parts. At the threshold, that methodological flaw undermines the soundness of the majority's conclusion.

the specified offense. *See State v. Avery*, 315 N.C. 1, 13–14 (1985) (upholding legality of short-form indictment for homicide)*; Lowe*, 295 N.C. at 603 (same for rape); *State v. Edwards*, 305 N.C. 378, 380 (1982) (same for sex offenses). According to the majority, those decisions could not exist if the jurisdictional rule is of constitutional berth.

Omitted from that flat syllogism is *why* our cases have sustained short-form indictments. It is true, as the majority notes, that short-form indictments are a qualified exception to the rule that an indictment must include a "plain and concise factual statement asserting facts supporting every element of a criminal offense and the defendant's commission thereof." *Rankin*, 371 N.C. at 886 (cleaned up); *Hunt*, 357 N.C. at 273. But that is because the substantive allegations that the State must include in short-form indictments brings those charging instruments "within constitutionally mandated parameters." *See Lowe*, 295 N.C. at 603. The State must name "[w]ith certainty both the defendant and victim" and allege the offense in "words having precise legal import." *Id.* at 604; *see also White*, 372 N.C. at 249 (holding that short-form indictment for child sex offense "was facially defective, and thus failed to establish jurisdiction in the trial court, because it identified the alleged victim only as 'Victim #1'" in violation of section 15-144.2's "statutory requirement that the indictment name the victim"). The indictments thus "charge[ ] the substance of the crime and put[ ] the defendant on notice that he will be called upon to defend against proof of the manner and means by which the crime was perpetrated." *Lowe*,

295 N.C. at 604; *see also State v. Tart*, 372 N.C. 73, 76–78 (2019) (analyzing substantive requirements for short-form homicide indictment).[3] For that reason, short-form indictments that include the statutorily required allegations "show on their face facts that give the court jurisdiction." *Lowe*, 295 N.C. at 604. This Court has thus approved that species of indictments only because—and only so long as— they "complie[d] with the constitutional requirement that the defendant be informed of the accusation against him." *Id.* Thus, under our precedent—and contrary to the majority's stilted reading—short-form indictments are tethered to and measured against their constitutional purpose. *See id.*; *see also White*, 372 N.C. at 251.[4]

---

[3] *Tart* offered specific guidance on the content required for a short-form homicide indictment to charge murder versus manslaughter. *See* 372 N.C. at 76–77, 79 ("[T]here are two express differences in the terminology utilized by the General Assembly to establish short-form indictments for the offenses of murder and manslaughter that are critical to the case at bar: (1) the reference in manslaughter offenses that the named defendant did slay an individual, compared with the reference in murder offenses that the defendant did 'murder' an individual; and (2) the mandated inclusion in an indictment for a murder offense of the essential element of 'malice aforethought,' while the allegation of 'malice aforethought' is not required to charge manslaughter. The critical and dispositive difference between short-form indictments for murder offenses and manslaughter offenses is the substantive allegation of the element of 'malice aforethought' in murder offense short-form indictments . . . . The prosecution's proper and necessary inclusion of the legal element 'malice aforethought' in the present indictment's charge of attempted first-degree murder substantively and constitutionally distinguishes this charge from an alleged manslaughter offense[.]" (cleaned up)).

[4] In criticizing this argument, the majority poses a simplistic question: why should we evaluate short-form indictments "against their ability to provide notice, but not engage in such an analysis of an allegedly defective indictment just because it is not a short-form indictment?" A singular standard for all indictments overlooks the differences between short-form and regular indictments. As this Court has made clear, short-form indictments are "special instrument[s], statutorily distinguished from other indictments." *See Hunt*, 357 N.C. at 270. Refined over the long arc of their use, they are the product of a lengthy dialogue between courts and the legislature. *See, e.g., Avery*, 315 N.C at 13–14 (cataloguing cases dealing with the substance of short-form homicide indictments). Short-form indictments serve to streamline and standardize charges for a narrow compass of offenses, while adhering

The majority's next argument is no stronger. Constitutionally defective indictments cannot be jurisdictional, it deduces, because violations of other constitutional rights are not jurisdictional. But the rights the majority cites—like the right to remain silent, to counsel, to a speedy trial, and to confront witnesses—are different in kind and function than the right to a valid indictment. That is because

---

to the constitutional requirement that the State "apprise the defendant of the charge against him with enough certainty to enable him to prepare his defense and to protect him from subsequent prosecution for the same offense." *See Lowe*, 295 N.C. at 603 (cleaned up). Put differently, short-form indictments were legislatively created and have been judicially upheld *because* they meet "the relevant constitutional and statutory requirements for valid [ ] offense indictments and serve[ ] [their] functional purposes with regard to both the defendant and the court." *See Tart*, 372 N.C. at 79; *see also State v. Holden*, 321 N.C. 125, 154 (1987) ("The notice provided by [N.C.G.S. § 15-144] is sufficient to satisfy the constitutional requirements of due process."); *State v. Young*, 312 N.C. 669, 675 (1985) (holding that the statutory notice provided by section 15A-2000(e) is sufficient to satisfy constitutional requirements of due process).

Given their careful calibration, the substance of the offense is "encompassed within the [statutorily prescribed] language of the short-form indictment," thus notifying the defendant of the State's accusations and equipping him to mount a meaningful defense at trial. *See State v. Braxton*, 352 N.C. 158, 175 (2000). The same cannot be said of offenses not chargeable by short-form indictment. So when the State indicts a defendant for one such offense, but omits an essential element, that defect is of unique legal and practical magnitude. For that very reason, this Court has scrutinized short-form indictments differently than other types of indictments. *See Hunt*, 357 N.C. at 273 ("The legislature has [ ] made it clear that murder and other crimes for which it has authorized the use of short-form indictments are to be treated differently in the application of N.C.G.S. § 15A-924."); *see also id.* at 276; *State v. Jerrett*, 309 N.C. 239, 259 (1983). Applying the same analysis to short-form and regular indictments, as the majority seems to suggest, would ignore the former's intentional formulation as a device that meets constitutional standards and satisfies the dictates of due process.

In all events, the majority's argument might have more force but for its ultimate holding in this case. Under today's decision, both statutory *and* constitutional defects stand on the same non-jurisdictional footing. The State's failure to indict a defendant in line with already-relaxed standards is further insulated behind the majority's newly minted prejudice hurdle—regardless of whether the error is of statutory or constitutional stature. For all the argument about what standard to apply to what type of defect, the practical effect of the majority's decision is to make all species of defects harder to remedy.

an indictment is the touchstone of a criminal trial—it forces the State to specify, and a grand jury to approve, specific criminal charges against a specific criminal defendant. *See White*, 372 N.C. at 251. Each of the rights cited by the majority, however, spring into legal force during the criminal proceedings. *See, e.g., Carpenter v. United States*, 585 U.S. 296, 317 (2018) (right to be free from unreasonable searches and seizures); *Miranda v. Arizona*, 384 U. S. 436, 474 (1966) (right to remain silent); *State v. Tucker*, 331 N.C. 12, 33 (1992) (right to counsel); *Crawford v. Washington*, 541 U.S. 36, 68 (2004) (right to confront witnesses); *State v. McCoy*, 303 N.C. 1, 7 (1981) (right to speedy trial). They are thus downstream of and dependent on the validity of the indictment itself.

Significant, too, the efficacy of those rights is anchored to the sufficiency of the indictment. The representation afforded by counsel, challenges to seized evidence or self-incriminating statements, the length of trial delays, and the questions posed to witnesses depend on the charges brought by the State and laid out in the indictment. *See Gallimore*, 272 N.C. at 533; *see also White*, 372 N.C. at 250–51; *Greer*, 238 N.C. at 327. A violation of those rights differs from a defective indictment in the same way that a flat tire halfway through a road trip differs from setting off with the wrong map. In both examples, one error happens once the proceedings are in motion; the other skews the journey from the start. In distinguishing indictments from other constitutional rights, then, the majority simply underscores their unique status and centrality to other procedural protections.

Finally, the majority notes that the right to an indictment is waivable in noncapital cases. If a valid indictment is essential for jurisdiction, it continues, then a defendant could not waive that requirement and, in effect, consent to jurisdiction. That analysis deploys the same rigidity for which the majority faults the common law. As explained above, the common law's conception of "jurisdiction" is not a carbon copy of modern doctrine. But the central intuition of the common law remedy was that a conviction premised on a defective indictment should not enjoy legal force because it was purchased at the price of due process. *See Whedbee*, 152 N.C at 776. When a noncapital defendant represented by counsel knowingly and voluntarily waives their right to an indictment, the due process guarantees protected by the procedural requirement are satisfied. *See Thomas*, 236 N.C. at 460–61 (examining the protections afforded to an accused who waives the right to an indictment). So a defendant waiving an indictment does not "consent" to jurisdiction, as the majority puts it, but verifies the accomplishment of the goals secured by that constitutional safeguard.

At bottom, the majority strips the jurisdictional remedy of constitutional stature because, in its view, "a court's jurisdiction to decide criminal cases flows directly from the people speaking through their constitution and statutes and cannot be destroyed by other means." That sentiment is difficult to square with the majority's bottom line. Professed adherence to constitutional directives rings hollow from a decision that cheapens the Constitution's guarantees of an indictment and adequate

notice by burying those rights behind a functionally impenetrable prejudice standard. The majority also ignores case after case in which this Court has rooted the jurisdictional remedy for defective indictments in the Constitution itself. *See, e.g., State v. Stevens*, 264 N.C. 364, 365 (1965); *State v. Jenkins*, 238 N.C. 396, 397–98 (1953); *Nugent*, 243 N.C. at 101; *Harris*, 145 N.C. at 458; *Greer*, 238 N.C. at 326–27; *Cole*, 202 N.C. at 596; *Hunter*, 299 N.C. at 41; *McClure*, 267 N.C. at 215; *Simpson*, 302 N.C. at 616. I would hold—as this Court had long affirmed—that vacating a conviction based on a fatally defective indictment honors the people's choices on how to allocate power and curb its abuse.

**E. Examination of Current Statutes**

Pivoting from history to modern statutes, the majority holds that the General Assembly did not codify the jurisdictional remedy into statutory law. Its analysis, however, is a result in search of a rationale. Though this Court has read the same statutory provisions to track the common law remedy, the majority, unsurprisingly, discards that precedent, importing its new jurisdictional/non-jurisdictional dichotomy into the legislature's language. *See, e.g., State v. Oldroyd*, 380 N.C. 613, 617 (2022) ("Subsection 15A-924(a)(5) is a codification of the common law rule that an indictment must allege all of the essential elements of the offense charged." (cleaned up)); *State v. Freeman*, 314 N.C. 432, 435 (1985) (holding that section 15A-924(a)(5) "incorporates the view expressed in prior holdings of this Court that an indictment must allege all of the essential elements of the offense charged" and "also

incorporates our long held view that the purposes of an indictment include giving a defendant notice of the charge against him so that he may prepare his defense and be in a position to plead prior jeopardy if he is again brought to trial for the same offense"); *Mostafavi*, 370 N.C. at 685–86 (explaining that the CPA "sought to eliminate the technical pleading requirements previously recognized for criminal pleadings" but referencing that statute in tandem with rule that indictment "must allege all the essential elements of the offense endeavored to be charged" (cleaned up)); *Rambert*, 341 N.C. at 176.

But even conceding the force of the majority's statutory interpretation, the legislature cannot dictate standards below the constitutional baseline. *See State v. Brice*, 370 N.C. 244, 249 (2017) (citing the CPA before noting that "[t]o be sufficient under our Constitution, an indictment 'must allege lucidly and accurately all the essential elements of the offense endeavored to be charged.' " (quoting *Hunt*, 357 N.C. at 267)). The majority only stitches together its statutory reading by first severing indictments from their constitutional anchorage—a result I believe is misaligned with precedent and principles.

## III. Conclusion

Ultimately, the majority's ruling flows from a hollow notion of justice. Justice is achieved, the majority intimates, when the State secures a "guilty" verdict—a defendant's challenges to the criminal proceedings are simply attempts to escape his just deserts. After all, the majority insinuates, a defendant would not be punished if

he did not deserve punishment. That intuition is misguided. It ignores how procedural protections like indictments boost reliability "by enhancing the possibility that truth will emerge from the confrontation of opposing versions of events and conflicting data." *In re J.U.*, 384 N.C. at 631 (Earls, J., dissenting) (cleaned up) (quoting *In re Gault*, 387 U.S. 1, 21 (1967)); *see also Cole*, 202 N.C. at 599 ("[W]ant of the requisite precision and certainty which may at one time postpone or ward off punishment of the guilty may, at another, present itself as the last hope and only asylum of persecuted innocence." (cleaned up)).

More important, the majority lets slip its cramped vision of rights. Due process, by its nature, "serves to define the rights of the individual while also delimiting the powers which the state may exercise." *In re J.U.*, 384 N.C. at 630 (Earls, J., dissenting) (cleaned up). It has etched into our "basic law the requirement" that "the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed." *Chambers v. Florida*, 309 U.S. 227, 237 (1940). That constitutional promise reaches the guilty and innocent alike. *See id.* at 241 ("[A]ll people must stand on an equality before the bar of justice in every American court."). And when the dictates of due process are most fervently tested—when the allure of expedience is at its strongest—the courts must redouble their commitment to protecting the Constitution's guarantees. *See id.*

There are higher values than stoking the churn of criminal prosecutions. Due process is one of them. For two centuries, this Court elevated procedural integrity

over bare expedience. But the majority today upsets that balance. Because the Court erodes yet another constitutional safeguard, I dissent.

Justice RIGGS joins in this concurring and dissenting opinion.